FOURSQUARE TABERNACLE CHURCH OF GOD IN CHRIST, Appellant–Defendant,

v.

The DEPARTMENT OF METROPOLITAN DEVELOPMENT OF the CONSOLIDATED CITY OF INDIANAPOLIS, Appellee–Plaintiff.

No. 49A02–9306–CV–264.

Court of Appeals of Indiana, Second District.

March 29, 1994.

B. Keith Shake, Henderson Daily Withrow & Devoe, Indianapolis, for appellant.

Robert A. Borgmann, Indianapolis, for appellee.

FRIEDLANDER, Judge.

Foursquare Tabernacle Church of God in Christ (Foursquare) appeals from the Marion County Municipal Court's grant of mandatory injunctive relief in favor of the Department of Metropolitan Development of the Consolidated City of Indianapolis (DMD). Upon appeal, Foursquare presents three issues for our review, which we restate as follows:

I. Did the trial court err in denying Foursquare's motion for summary judgment?

II. Do the findings of fact and conclusions of law support the judgment?

III. Did the DMD exceed its authority in ordering Foursquare to perform certain repairs on its buildings?

The facts favorable to the judgment are as follows. Foursquare is a small Indianapolis church with approximately thirty-five members, and an annual income of approximately $10,000. When this action was commenced, Foursquare owned 75–80 properties, 7[1] of

---

1. The parcels of real property in question, located in Indianapolis, include:
   1) a building at 655 E. 24th Street;
   2) a house at 2340 N. Broadway;
   3) a house and garage at 2351 N. Broadway;
   4) a house and garage at 2305 N. Broadway;
   5) a house at 2310 N. Broadway;
   6) a house at 2344 N. Broadway; and

which are the subject of the instant dispute. Foursquare acquired its properties with the intention of building a $6,000,000 tabernacle at an unspecified future date, an intention it currently maintains. Foursquare acknowledges, however, that it has no money in its building fund.

On August 9, 1990, pursuant to Indiana Code 36–7–9–5(a)(4),[2] the DMD ordered Foursquare to make certain repairs upon the buildings in question. Those orders were affirmed at a November 28, 1990 administrative hearing, pursuant to I.C. 36–7–9–7. Foursquare failed to comply with the orders and, pursuant to I.C. 36–7–9–17, on March 6 and 12, 1991, the DMD filed for mandatory injunctions in the Marion Superior Court to enforce the orders. The trial court denied Foursquare's motion for summary judgment and granted the injunctions following a November 10, 1992 hearing, thereby ordering Foursquare to comply with the DMD's orders. Foursquare appeals only certain portions of those orders, including the following:

"3. [A]s to the house at 655 E. 24th Street:

\* \* \* \* \* \*

4) Repair and weathertight roof to a structurally sound condition.

5) Install and weathertight exterior siding in the rear midsection of the structure.

\* \* \* \* \* \*

4. [A]s to the house at 2340 Broadway Street:

\* \* \* \* \* \*

3) Repair and weathertight roof to a structurally sound condition.

4) Repair foundation to a weathertight and structurally sound condition.

5) Repair all chimneys, flues and vents to a safe and functional condition.

6) Install or repair gutters and soffits to a safe and functional condition.

\* \* \* \* \* \*

5. [A]s to the house at 2351 Broadway Street:

\* \* \* \* \* \*

3) Repair and weathertight roof to structurally sound condition.

4) Repair foundation to a weathertight and structurally sound condition.

5) Repair gutters and soffits to a safe and functional condition.

\* \* \* \* \* \*

6. [A]s to the garage at 2351 Broadway Street:

\* \* \* \* \* \*

2) Repair and weathertight all exterior siding.

\* \* \* \* \* \*

8. [A]s to the house at 2305 N. College Avenue:

\* \* \* \* \* \*

2) Repair and weathertight roof to a structurally sound condition.

3) Repair foundation to a weathertight and structurally sound condition.

4) Repair all chimneys, flues and vents to a safe and functional condition.

5) Repair and weathertight all exterior siding.

6) Install or repair gutters and soffits to a safe and functional condition.

\* \* \* \* \* \*

9. [A]s to the house at 2310 N. College Avenue:

\* \* \* \* \* \*

4) Repair and weathertight to a structurally sound condition.

tion or maintenance prescribed by law."

7) a house at 2354 N. Broadway.

2. "(a) The enforcement authority may issue an order requiring action relative to any unsafe premises, including:

\* \* \* \* \* \*

(4) repair of an unsafe building to bring it into compliance with standards for building condi-

5) Repair foundation to a weathertight and structurally sound condition.

6) Repair all chimneys, flues and vents to a safe and functional condition.

\* \* \* \* \* \*

9) Repair and weathertight all exterior siding.

10) Install or repair gutters and soffits to a safe and functional condition.

\* \* \* \* \* \*

10. [A]s to the house at 2344 N. College Avenue:

\* \* \* \* \* \*

4) Repair and weathertight roof to a structurally sound condition.

5) Repair foundation to a weathertight and structurally sound condition.

6) Repair all chimneys, flues and vents to a safe and functional condition.

7) Repair and weathertight all exterior siding.

8) Install or repair gutters and soffits to a safe and functional condition.

\* \* \* \* \* \*

11. [A]s to the house at 2354 N. College Avenue:

\* \* \* \* \* \*

3) Repair and weathertight roof to a structurally sound condition.

4) Repair all chimneys, flues and vents to a safe and functional condition.

5) Install or repair gutters and soffits to a safe and functional condition." *Record* at 188–192.

Foursquare contends that I.C. 36–7–9–5(a)(4) does not authorize the DMD to order Foursquare to 1) weathertight the sidings, roofs, and gutters, 2) repair or install gutters and soffits, and 3) repair chimneys, flues and vents to a functional condition, because such "go far beyond the statutorily required element of 'safety.'" Brief of Appellant at 19.

### I. *Summary Judgment Motion*

When reviewing a summary judgment ruling, our task is the same as was the trial court's. We do not weigh the evidence, but consider the facts in the light most favorable to the nonmoving party in order to determine whether there exist designated genuine issues of material fact upon an essential element of a claim. *Collins v. Covenant Mutual Insurance Co.* (1992), Ind.App., 604 N.E.2d 1190.

Foursquare had been involved in a dispute with the Marion County Board of Review and the State Board of Tax Commissioners since 1982 regarding the church's tax-exempt status. Ultimately, in 1990, the Indiana Tax Court ruled that Foursquare should be granted the exemption. Foursquare argued in a November 6, 1991 summary judgment motion that the poor condition of the subject properties is a direct result of Foursquare being forced to use its financial resources to fight "City Hall" rather than using its money for maintenance and repairs of the buildings. Foursquare claimed the DMD was estopped from pursuing the instant proceedings because of the DMD's "unclean hands." The trial court denied the motion.

Foursquare also contends that the DMD is estopped from ordering repairs because of language contained in the Agreed Entry and Judgment (Agreed Judgment), which resolved the tax issue between the parties. The Agreed Judgment states that Foursquare "shall prevail on its claims asserted in its Petition," and the petition provides that "the imposition of property tax upon the real estate will materially and substantially deter the pursuit of the Church's intentions" with regard to the properties. *Record* at 155. In summary, Foursquare argues that the DMD is estopped from pursuing its case based upon collateral estoppel and unclean hands.

#### A. *Collateral Estoppel*

Foursquare contends that agreed judgments are to be broadly construed so as to promote settlement of conflicts and avoid protracted litigation. Leaving aside the question of whether there was privity between the DMD and the Marion County Board of Review (Foursquare's party opponent in the tax case), Foursquare is incorrect in asserting that the Agreed Judgment addresses the instant dispute.

The Agreed Judgment resolved the question of Foursquare's tax-exempt status. In-

cluded in the Agreed Judgment were the stipulations that the failure to grant Foursquare's tax exemption was in violation of Foursquare's civil rights, and that imposition of property tax upon Foursquare's properties would deter the church in pursuit of its goal to build a tabernacle. We have examined the Agreed Judgment and do not discern any portion of that document that even marginally pertains to the questions of the condition of the properties or the detrimental effect of legal costs incurred by Foursquare.

■ It is true that any unambiguous term of an agreed judgment will be given effect. The rule of broad construction to which Foursquare refers, however, applies when construing ambiguous terms of an agreed judgment. *See Hendrickson v. Hendrickson* (1988), Ind.App., 531 N.E.2d 544, *trans. denied.* There is a significant difference between basing a conclusion upon a broad reading of an ambiguous term, on one hand, and forging said conclusion out of whole cloth, on the other. The agreed judgment simply does not address any issue other than the tax-exempt status of the church. Were we to ascribe to the Agreed Judgment such wide-sweeping effect as Foursquare suggests, it would amount to a declaration that, with respect to the properties in question, Foursquare stands beyond the reach of regulation or oversight on the part of the City of Indianapolis or any of its agencies. The agreed judgment simply cannot be read so broadly.

Collateral estoppel applies only when a particular issue is adjudicated in a legal proceeding and then placed into issue again in a subsequent action. *State Farm Mut. Auto. Ins. Co. v. Glasgow* (1985), Ind.App., 478 N.E.2d 918. The issues of the safety and physical condition of the buildings were not addressed in the Agreed Judgment; thus, collateral estoppel does not bar the DMD's action.

### B. *Unclean Hands*

■ Citing the equitable doctrine of "unclean hands," Foursquare contends that the DMD's action is forbidden because "the City's conduct very directly caused, or at the very least materially contributed to, the stagnant condition of the Properties." Brief of Appellant at 37. For purposes of our analysis we assume, without deciding, that the requisite privity exists between the Review Board and the DMD.

■ A party seeking the equitable relief of injunction must come into court with clean hands. *Elder v. City of Jeffersonville* (1975), 164 Ind.App. 422, 329 N.E.2d 654. "Unclean hands" is an equitable doctrine which means that one who seeks relief in a court of equity must be free of wrongdoing in the matter before the court. *W & W Equipment Co., Inc. v. Mink* (1991), Ind.App., 568 N.E.2d 564, *trans. denied.* For the unclean hands maxim to apply, the party who is so charged must have been guilty of intentional misconduct. *Tomahawk Village Apartments v. Farren* (1991), Ind.App., 571 N.E.2d 1286. The doctrine is not favored by the courts and is applied with reluctance and scrutiny. *Id.*

■ Our research reveals no case in which the doctrine of unclean hands has been applied based solely upon the fact of a prior unfavorable judgment, and for good reason. It is axiomatic that a party which does not prevail in a legal action may nevertheless have brought the action with a good faith belief in its merits. Therefore, unclean hands must be premised upon more than failing to prevail in a prior legal proceeding.

Foursquare claims that the DMD's intentional misconduct is made manifest by reading the Agreed Judgment in conjunction with Foursquare's Petition For An Original Tax Appeal (Tax Appeal Petition). The Agreed Judgment states that "[Foursquare] shall prevail on its claims asserted in its Petition and shall have Judgment entered in its favor thereon." *Record* at 155. The Tax Appeal Petition states:

"The imposition of property tax upon the real estate will materially and substantially deter the pursuit of the Church's intentions, which are wholly for religious purposes. The denials of [Foursquare's] Applications for Exemptions are arbitrary, capricious and discriminatory; are contrary to the provisions of Ind.Code § 6-1.1-10-16(d); are in violation of the 1st and 14th Amendments to the United States Constitution, and of Ind. Const. Art.

1, Sec. 2, Art. 1 Sec. 4, and Art. 10, Sec. 1; and violate [Foursquare's] and its members' civil rights." *Record* at 128.

Foursquare argues that, by virtue of the Agreed Judgment, the DMD admitted that it was guilty of intentional ("arbitrary, capricious and discriminatory") misconduct in denying Foursquare's application for tax exempt status.

It is contrary to the spirit in which our courts have applied the doctrine to premise a finding of the requisite intentional misconduct upon such evidence. Our courts' reluctance to apply the doctrine indicates that evidence of intentional misconduct must be of a more substantial nature than Foursquare offers. Although the Agreed Judgment states that Foursquare prevails upon all claims set out in its Tax Appeal Petition, the statement should be read in conjunction with the general purpose of the Agreed Judgment, i.e., settling the tax question, and understood only in that context. Beyond the technical argument advanced based upon the wording of the two documents, Foursquare offers no evidence of intentional misconduct, i.e., evidence that the Review Board's action was prompted by nefarious motive or with knowledge that the action lacked merit. The doctrine of unclean hands, therefore, is inapplicable.

■ Finally, we note that, even were the doctrine of unclean hands applicable in the instant case, the trial court's ruling is cor-rect. Unclean hands is merely one maxim to be applied by the court when considering the equitable remedy of injunctive relief and is not by itself dispositive of the question. Moreover, the extent to which the Review Board's actions affected Foursquare's ability to properly care for and maintain the properties is a question of fact rendering summary disposition inappropriate.[3]

## II. *Findings of Fact and Conclusions of Law*

■ When reviewing a judgment in which special findings have been entered, such as the instant case, we must determine whether the findings are sufficient to support the judgment. *Vanderburgh County Bd. of Commissioners v. Rittenhouse* (1991), Ind. App., 575 N.E.2d 663, *trans. denied.* Our task in such instances is two-fold. We must first determine whether the evidence supports the findings, and then whether the findings support the judgment. *Id.* "The judgment will be reversed only if it is clearly erroneous, and a judgment is clearly erroneous only when it is unsupported by the findings of fact and conclusions of law entered on those findings." *Id.* at 665.

The DMD correctly notes that Foursquare has not challenged whether the evidence supports the findings; thus we accept the findings as true. The remaining determination to be made is whether the "findings suffi-

---

**3.** The following recitation of facts is taken from an opinion of the Tax Court of Indiana in a prior proceeding involving the same subject matter as is before us in the instant appeal:

"To this date, the parcels of property have not been used for any purpose by the Church and the property has not produced any income.

\* \* \* \* \* \*

The Church has had a congregation of approximately thirty-five active members since 1982. The Church has brought in approximately $10,000 per year in income, which has been just enough to meet its expenses. The Church has not designated any savings fund for the intended construction of the world class tabernacle, which is expected to cost up to $5,000,000. The minister of the Church believes that the Church will one day be able to afford such a major project.

In order to build the proposed facility, the Church must acquire additional properties not yet owned by the Church. These properties are necessary to accommodate the proposed project, yet may never be available. There is no proper zoning in effect and no steps have been taken to obtain proper zoning. The only steps taken by the Church to plan the construction of the proposed project occurred in 1984, when the Church contacted Myler Church Building Systems, which merely sent some standard information to the Church. The Church has not made any further contact with this company or any other company regarding construction of the tabernacle." *Foursquare Tabernacle Church of God in Christ v. State Board of Tax Commissioners* (1990), Tax Court, 550 N.E.2d 850, 851.

Foursquare also admitted at oral argument before this court, contrary to an assertion in its appellate brief, that it has not complied with any of the repairs and maintenance orders issued in the instant case which it acknowledges are appropriate.

ciently disclose a valid basis underlying the legal result reached in the judgment." *Wedmore v. Jordan Motors, Inc.* (1992), Ind.App., 589 N.E.2d 1180, 1185, *trans. denied.*

### III. *"Unsafe" as Used in I.C. 36–7–9–5(a)(4)*

Indiana Code 36–7–9–5(a)(4) provides that an enforcement authority, in this case the DMD, may issue orders requiring action pertaining to premises that are "unsafe," including "repair of an unsafe building." The crux of the instant controversy is whether the orders of which Foursquare complains are authorized by statute, i.e., whether weathertighting roofs, foundations and siding, repairs to gutters and soffits, and restoring chimneys, flues and vents to a safe and functional condition address an "unsafe" condition as that term is used in the statute.

The interpretation of a statute is a question of law to be decided by the court. *Joseph v. Lake Ridge School Corp.* (1991), Ind. App., 580 N.E.2d 316, *trans. denied.* We need not grant deference to the trial court's interpretation of the statute. Instead, we must make an independent determination as to the statute's meaning and application to the facts of the case before us. *Indiana State Prison and State Employees' Appeals Commission v. Simchak, et al.* (1993), Ind. App., 615 N.E.2d 112.

Chapter 9 of Title 36 governs the enforcement of building standards. Pursuant to I.C. 36–7–9–5, an enforcement authority may order an owner to repair a building if that building is "unsafe." Indiana Code 36–7–9–4 provides the definition of "unsafe" in this context:

"Sec. 4. (a) For purposes of this chapter, a building or structure, or any part of a building or structure, that is:

(1) in an impaired structural condition that makes it unsafe to a person or property;

(2) a fire hazard;

(3) a hazard to the public health;

(4) a public nuisance; or

(5) dangerous to a person or property because of a violation of a statute or ordinance concerning building condition or maintenance;

is considered an unsafe building."

This section further states that "[t]he ordered action must be reasonably related to the condition of the unsafe premises...."

It is therefore apparent that an order issued pursuant to I.C. 36–7–9–5 must be tailored to remedy a condition that renders a building "unsafe" as that term is used in I.C. 36–7–9–5(a)(4), and as defined in I.C. 36–7–9–4(a)(1)–(5). Our inquiry here is two-fold: (1) Did the conditions addressed by the repairs render the buildings "unsafe?" (2) Are the ordered repairs reasonably related to the unsafe conditions?

### A. *"Safe"*

The trial court's Conclusions of Law state that the buildings in question were "in a severe state of disrepair" and were "unsafe buildings as that term is defined in IC 36–7–9–4." *Record* at 196–97. We reproduce below a compilation of the relevant findings.

* "the rear gutters are full of debris and dead vegetation, and the downspouts are missing" (*Record* at 192);

* "the foundation of the house is failing, mortar has been washed away from between the bricks, and the bricks are resting on top of of each other" (*Record* at 193);

* "the gutters are rusted through or missing, and the downspouts are missing" (*Record* at 193);

* "mortar is missing from each of the chimneys, and the south chimney is listing" (*Record* at 193);

* "the roof over the front porch and rear portion of the house are badly deteriorated" (*Record* at 193);

* "the front porch roof is badly deteriorated and collapsing" (*Record* at 193);

* "Asphalt siding is broken or missing in several places around the house" (*Record* at 193);

* "the gutters are rusted through or missing in several places, and the downspouts are missing or not connected to the gutters" (*Record* at 193);

* "loose shingles have blown from the roof, and the south portion of the roof is open,

exposing spaced sheathing and rafters to the weather" (*Record* at 193);

* "the rafter ends are rotting" (*Record* at 193);

* "the soffits around the front porch are hanging loose" (*Record* at 193);

* "there are loose bricks in the chimney" (*Record* at 193);

* "on the south portion of the roof, the spaced sheathing and rafters are exposed and rotting" (*Record* at 194);

* "roll roofing has blown off the roof and littered the yard" (*Record* at 194);

* "there are loose bricks in the front porch foundation and the north end of the porch foundation has collapsed (*Record* at 194);

* "on the rear porch, the foundation is missing in several spots, the wood framing and floor boards have rotted, the ceiling boards are hanging loose and falling, and the corner support is missing (*Record* at 194);

* "on the rear of the house, loose metal is hanging from the roof" (*Record* at 194);

* "on the south of the house, fallen bricks are in the yard" (*Record* at 194);

* "roofing material that has been exposed by the missing roll roofing is badly deteriorated" (*Record* at 195);

* "a gutter board on the south side of the house is hanging loose, and the exposed rafter ends are rotting" (*Record* at 195);

* "siding on the south side of the building has rotted through exposing the framing of the building" (*Record* at 195).

The trial court also found that all of the buildings are located in a residential neighborhood, and one of the buildings is located next to a public school.

The findings convey a picture of buildings in various stages of deterioration, which results in dilapidation. Parts of the various structures, including roofing material, bricks, siding, soffits, chimneys, and gutters, are either falling to the ground, or in imminent danger of doing so. Undoubtedly, objects falling from a building pose sufficient danger to passersby so as to render such building "unsafe."

■ Similarly, if a building deteriorates to the point that the entire structure, or any part thereof, is in danger of collapsing, the attending risk to persons renders the building "unsafe." The findings reflect that the foundations of several of the buildings in question were deteriorating such that the structure's integrity and safety at that location was compromised. This condition renders such buildings unsafe.

Some of the findings reproduced above do not relate to present unsafe conditions of the various buildings. However, we conclude that some of the conditions recounted in the trial court's findings of fact, i.e., collapsing foundations and parts of the structures are falling or in danger of falling or are strewn about on the ground, render the buildings "unsafe" as that term is used in the statute.

### B. *Repair Orders*

The second step of our inquiry involves a determination of whether the repairs ordered by the trial court are reasonably related to the unsafe conditions of the buildings.

■ 1. *Weathertighting siding, roofs, and foundations.*—By definition, the purpose of making these surfaces weathertight is to secure them from the corrosive forces of weather. The effects of such forces are apparent here. Siding and roofing materials have become detached from structures and have fallen away, thus exposing yet more material to the weather; wood is rotting; the bonds between bricks or blocks of foundations are crumbling, and foundations, and all which rests upon them, are in danger of collapsing. We conclude that to the extent that making these surfaces weathertight is reasonably related to present unsafe conditions of the buildings, ordering repairs to that effect is permissible. Such is true, however, only if the repairs would render the buildings safe in those ways in which they currently are unsafe.

■ 2. *Repairing or installing gutters and soffits.*—The gutters of some of the buildings are rusted through, some are falling down, and others are missing altogether. To the extent that they are falling from the building, the gutters pose a danger, and or-

ders which compel Foursquare to secure them to the building are entirely appropriate.

■ Implicit in the findings is the trial court's determination that the lack of functional gutters and downspouts renders the premises unsafe. A building's gutter system is designed to dispose of rainwater in order to protect the building from rainwater and its destructive effects. The effects of the lack of a functional gutter system are apparent. The gutters themselves, in some instances, have rusted and fallen from the building. In the absence of gutters, some surfaces have been exposed to water that otherwise would not have been, and are rotting as a result. It is not unlikely that improper rainwater run-off is a root cause of the generally poor condition of the buildings, including the foundations. We conclude that the lack of functional gutters makes the buildings unsafe, and therefore that installing and repairing gutters is an appropriate remedial measure which is reasonably related to current unsafe conditions of the buildings.

A soffit is horizontal siding under a roof overhang. On one of the buildings, the soffits around the front porch were hanging loose. In this condition, the soffits are in danger of falling, which is clearly an unsafe condition. Therefore, the trial court is authorized to order that the loose soffit be secured. Additionally, the trial court, for reasons discussed previously with respect to roofs, could properly order Foursquare to install a soffit for safety reasons where one was missing. As set out above, a building with missing soffits would be exposed to weather and subject to dangerous deterioration.

■ 3. *Repairing chimneys, flues, and vents to a functional condition.*—The trial court ordered Foursquare to comply with DMD orders requiring, with respect to five of the buildings, that Foursquare "[r]epair all chimneys, flues and vents to a safe and functional condition." *Record* at 189, 190, 190–91. Foursquare complains that the court exceeded its statutory authority in requiring restoration to a "functional" condition.

Defects exist in chimneys of three of the buildings, including such problems as missing mortar, loose bricks, and an entire chimney listing to one side. Such defects certainly compromise the stability of a chimney and constitute unsafe conditions. The trial court therefore is authorized to order Foursquare to repair those defects. At issue here is the trial court's use of the term "functional" in describing the repairs to be made.

The DMD acknowledged in oral argument before this court that the use of that particular term was unfortunate. Clearly, repairs necessary to make a structurally unsound chimney functional may go beyond those which would be necessary merely to make the structure *safe*. To the extent that the trial court's order may be interpreted to mandate that Foursquare make the chimneys, vents, and flues functional, as opposed to merely safe, it is in error. We conclude that the term "functional" as used in the trial court's order was mere surplusage, and that the import of the order was that the chimneys, vents and flues be restored to a *safe* condition. That is, that they be made stable and weathertight.

■ In summary, the trial court is without authority under the statute to order preventative maintenance, that is, to order those repairs that a prudent property owner would anticipate and make to preserve the physical integrity and value of his property. The trial court's order to make repairs must be grounded upon a finding that such repairs are necessary to correct an existing unsafe condition or to forestall further deterioration of an existing unsafe condition. We do not make findings of fact upon appeal but conclude from the record and the trial court's order here that the court made that determination.

The trial court's order is affirmed to the extent that it requires Foursquare to make the chimneys, vents, and flues safe, and reversed to the extent that it may be under-

stood to require work necessary to make these structures functional, and not merely safe.

We reverse the trial court's order to the extent that it requires Foursquare to make the chimneys, flues, and vents "functional," and affirm the trial court's order in all other respects.

SULLIVAN and NAJAM, JJ., concur.