

FILED

Nov 15 2018, 9:02 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Patrick B. McEuen
Portage, Indiana

ATTORNEYS FOR APPELLEES

David C. Jensen
John M. McCrum
Robert J. Feldt
Kevin T. McNamara
Eichhorn & Eichhorn, LLP
Hammond, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

Jose Andrade,

*Appellant-Plaintiff,*

v.

City of Hammond and
Hammond Board of Public
Works and Safety,

*Appellees-Defendants.*

November 15, 2018

Court of Appeals Case No.
18A-MI-1199

Appeal from the Lake Superior
Court

The Honorable Calvin D.
Hawkins, Judge

Trial Court Cause No.
45D02-1508-MI-15

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Plaintiff, Jose Andrade (Andrade), appeals the trial court's order affirming the decision of Appellee-Defendant, Hammond Board of Public Works and Safety (the Board), to restore the 6609 Jefferson Avenue Home (the Home) owned by him to a single-family dwelling.

We affirm.

# ISSUES

Andrade presents us with three issues on appeal, which we restate as:

1) Whether the Board exceeded its statutory authority when it ordered Andrade to restore the Home to a single-family dwelling;

2) Whether the Board's finding that the Home was originally built as a single-family residence was supported by substantial evidence; and

3) Whether the failure of the City of Hammond (the City) to produce the 1927 Hammond building code in response to Andrade's subpoena *duces tecum* merits reversal.

# FACTS AND PROCEDURAL HISTORY

Andrade is a landlord who owns thirty-two properties with a total of sixty-two rental units. The Home was constructed in Hammond in 1927 and was purchased by Andrade in 1998. The Home was divided into five separate

apartments before Andrade purchased it, and he continued to rent the five units. The City first inspected the Home on March 13, 2013. That inspection yielded a Notice of Violation mailed on May 10, 2013, (the 2013 Notice) which provided that the Home had been found to be an unsafe building in violation of Indiana's Unsafe Building Law (the UBL). The 2013 Notice listed various Hammond Municipal Code and International Building Code violations that the City relied upon to conclude that the Home was unsafe. All five of the units of the Home were marked as uninhabitable by the City. On May 14, 2015, the Board held a hearing on the 2013 Notice in Andrade's absence, which the Lake County Superior Court subsequently found had taken place without proper notice to Andrade. The Lake County Superior Court remanded the matter to the Board for further proceedings.

[5] Because of the amount of time that had elapsed since the first inspection, the City had the Home re-inspected on September 8, 2016, by Building Commissioner Kurtis Koch (Koch). As a result of that inspection, the City issued Andrade a second Notice of Violation (the 2016 Notice) which provided that the Home had been found to be an unsafe building pursuant to the UBL. The 2016 Notice identified twelve groupings of impaired structural conditions, eleven groupings of fire hazards, and six groupings of "a violation of a statute or ordinance concerning building condition or maintenance" all of which, under the UBL, rendered the Home an unsafe building. (Appellant's App. Vol. II, p. 42).

[6]     A hearing on the 2016 Notice was scheduled for January 12, 2017. On January 4, 2017, Andrade served the City's Chief of Inspections Kelly Kearney (Kearney) with a subpoena *duces tecum* requesting that he bring to the hearing all "regulations, ordinances, and/or statutes" used by him to support his previous testimony before the Board at the first hearing regarding various unsafe conditions at the Home. (Appellant's App. Vol. II, pp. 44-45). The City did not comply with Andrade's subpoena.

[7]     The January 12, 2017, hearing took place before the three-member Board. Koch testified regarding various unsafe conditions in the home, including the Home's balloon framing which was typically used in single-family homes built around 1927. This was a significant safety concern because that type of framing allowed fire and smoke to travel through a home unimpeded. Koch also testified that the Home's rear stairway was unsafe under the UBL because the stair width was inadequate to accommodate any first responders and their gear in an emergency. Koch identified other unsafe conditions in the home, such as the basement entrance which could not accommodate first responders, the fact that the bedroom basement lacked windows preventing escape in case of fire, and a chimney chase with inadequate fire stopping. Koch concluded that the Home was built in 1927 as a single-family home because it was built to the same standards as hundreds of other single-family homes in the area and had none of the structural elements which would have been present in a multi-family structure built in 1927. It was Koch's opinion that, in its current configuration, the Home was unsafe. Andrade's counsel cross-examined Koch

on a variety of topics, including the width of the stairs in the rear stairway, the Home's water heater for which Andrade also had been cited, inaccuracies in the City's permitting lists, and the similarities between the two inspection reports which formed the basis of the 2013 and 2016 Notices of Violation.

[8] Kearney testified at the January 12, 2017, hearing that the City's ledger of building permits showed that the Home was issued a building permit for a "[n]ine room frame" which indicated to him that the Home had been constructed as a single-family home. (Appellee's App. Vol. II, p. 103). Kearney noted that during that era, if a structure was to be built with multiple apartments, it would have been indicated in the ledger entry. It was Kearny's opinion that the Home was unsafe because it had impaired structural conditions, fire hazards, and ordinance violations. Kearny requested on behalf of the City that the Board remove any apartments from the Home that were unsafe.

[9] On cross-examination, Andrade's counsel asked Kearney questions about what the 1927 Hammond building code would have required in terms of basement window height, the use of wooden support beams in the home, kick plates on stairs, hallway doors, basement ceiling height, and electrical meters. A discussion ensued between Andrade's counsel and the City's counsel regarding the City's failure to bring to the hearing the documents Andrade sought in his subpoena *duces tecum*. The City posited that it was not required to bring the requested documents for a variety of reasons, including that the material sought was publicly available. The discussion ended as follows:

Andrade's Counsel:  But I asked for the ones that particularly he relied on in particular.

City's Counsel:  Which are identified in the notice that's already been offered in the exhibit.

Andrade's Counsel:  Let's move on.  Let's move on.

(Appellee's App. Vol. II, p. 120).

[10]     Andrade offered testimony and documentary evidence to the Board that he contended proved that the Home was built as a multi-family unit in 1927. Andrade's counsel argued to the Board during Andrade's testimony that "if this house is ruled a single-family house, [Andrade] knows that, you know, it's over for him with this house."  (Appellee's App. Vol. II, pp. 182-83).

[11]     At the end of the hearing, the City argued to the Board that, regardless of whether the Home was built as a single or multi-family home, the UBL gave them the authority to act to address unsafe buildings.  During his closing remarks to the Board, Andrade's counsel noted that "[o]pposing counsel has indicated that the issue is the [UBL], which we understand."  (Appellee's App. Vol. III, p. 2).  Andrade's counsel also argued

> And [Andrade] understood that his building was a single-family home – was not – excuse me – was not a single-family home when constructed.  And I want to focus your Board on that – the Board on that issue.  Because if it is not a single-family home, then it will stay the way it is depending on what you do in your decision.

However, if it is ruled that it was a single-family home, then this property can't exist economically.

(Appellee's App. Vol. III, p. 2).

[12] On March 9, 2017, the Board issued twenty-five findings of fact and its conclusions of law in which it found in relevant part as follows:

> 5. The property as currently configured contains five apartment units, including one in the basement, two on the main floor, and two on the second floor.
>
> * * * *
>
> 7. Commissioner Koch found that the cellar apartment was unsafe, as were two second floor apartments and one first floor apartment.
>
> * * * *
>
> 19. The ledger entry in the City of Hammond records reflects that the building at 6609 Jefferson was built as a nine-room frame construction.
>
> 20. There are no building permits to show that the property was lawfully converted to a multi-dwelling property at any point in its history.
>
> 21. The building was not erected as a multi-unit structure in 1927 and was never legally converted to a multi-unit apartment building thereafter.

22. The property at 6609 Jefferson is currently zoned R1-U, which is Urban Single Family Residential District, and as such allows for two-family attached dwelling units not to exceed twenty percent (20%) of the dwelling units on the block.

23. The Inspections Department seeks to have the unsafe units removed on the property pursuant to the Indiana Unsafe Building Law, as adopted by local ordinance.

* * * *

25. Mr. Andrade has made some general repairs to the property since he bought it in 1998; however, there is no evidence that Mr. Andrade has made or has caused to be made major structural repairs that would remove the unsafe conditions existing on and within the premises.

(Appellant's App. Vol. II, pp. 187, 189-90). The Board concluded that "[a]s currently configured, [the Home] contains structural conditions and fire hazards that are dangerous to its occupants, rendering the premises unsafe and in violation of [the UBL]." (Appellant's App. Vol. II, p. 194). In addition, the Board concluded that the apartments in the Home were never lawfully constructed and cited to case law pertaining to the zoning law concept of a lawful non-conforming use. The Board found that the apartments could not be lawfully occupied in the Home's present condition but that "[s]hould proper zoning approval be obtained, the maximum number of units permitted at this location is two units." (Appellant's App. Vol. II, p. 195). The Board ordered Andrade to restore the Home to a single-family dwelling.

[13]    Andrade sought judicial review of the Board's orders. On February 8, 2018, the trial court held an evidentiary hearing on Andrade's request for review. On March 28, 2018, the trial court entered its findings of fact and conclusions of law in which it found in relevant part:

> 11. The Hammond building inspectors offered opinion testimony to the Board in 2017 that [Andrade's] building "does not meet any Code for multi-family dwellings in 1927", but the failure to produce the Code, as subpoenaed by [Andrade], precluded any cross examination as to the grounds for those opinions.

(Appellant's App. Vol. II, pp. 15-16). The trial court found that the Board's findings, namely that the Home had the unsafe conditions of inadequate fire stopping, lack of fire blocking, flammable support beams, inadequate fire separation, improperly braced stairs of inadequate width, lack of basement apartment bedroom windows, low basement ceilings that would contribute to smoke accumulation and prevent egress in an emergency, and inadequate smoke detectors, were well-supported by the record. The trial court concluded that the original permitting of the Home as either single-family or multi-family was not determinative of whether the Home was unsafe as defined by the UBL and as found by the Board. The trial court upheld the Board's order that Andrade restore the Home to a single-family dwelling.

[14]    Andrade now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

This matter comes before us on appeal from a judicial review of an administrative order. The City and the Board are not subject to the Administrative Orders and Procedures Act (AOPA), which specifically excludes political subdivisions. Ind. Code § 4-21.5-1-3 (excluding political subdivisions from the definition of "agency"). The City and the Board are political subdivisions pursuant to Indiana Code sections 36-1-2-13 and -10. Nevertheless, Indiana courts have applied general administrative law principles to contexts outside of administrative agency actions governed by AOPA, and so, as in those cases, we will apply those principles here. *See City of Jasper v. Collingnon*, 789 N.E.2d 80, 87 (Ind. Ct. App. 2003) (applying administrative law principles to action taken by a city and its Wage Committee), *trans. denied*.

The UBL provides that an action taken to enforce its provisions is subject to judicial review, which is done *de novo*. Ind. Code § 36-7-9-8(a), (c). Under the *de novo* standard of review, a court

> may, to a limited extent, [weigh] the evidence supporting the finding of fact by an administrative agency. But it may negate that finding only if, based upon the evidence as a whole, the finding of fact was
>
> (1) arbitrary,
>
> (2) capricious,
>
> (3) an abuse of discretion,

(4) unsupported by the evidence or

(5) in excess of statutory authority.

*Kollar v. Civil City of South Bend*, 695 N.E.2d 616, 619 (Ind. Ct. App. 1998), *trans. denied*. A trial court may not substitute its judgment for that of the agency, and the facts are to be determined but once. *Id.* at 619-20. What is more, when, as in this case, the trial court enters special findings of fact pursuant to Indiana Trial Rule 52(D), we conduct a two-step review wherein we first determine whether the evidence supports the findings and then whether the findings support the judgment. *Foursquare Tabernacle Church of God in Christ v. Dep't of Metro. Dev. of Indianapolis*, 630 N.E.2d 1381, 1386 (Ind. Ct. App. 1994), *trans. denied*. We will reverse the trial court's judgment only if it is clearly erroneous, and a judgment is clearly erroneous only if it is unsupported by the findings of fact and conclusions of law entered on those findings. *Id.*

## II. *The Board's Authority*

[17] Andrade contends that the Board exceeded its statutory authority by acting as a zoning authority when it ordered him to restore the Home to a single-family dwelling.[1] The City counters that it acted within the authority provided to it by

---

[1] Andrade's contentions that the Board's actions were in violation of the Takings Clause and were an abuse of discretion are undeveloped and unsupported by cogent authority in contravention of Indiana Appellate Rule 46(A)(8)(a) (appellate argument must be supported by cogent argument supported by citations to authority). Those arguments are waived for our review. *See Price v. Review Bd. of Indiana Dep't of Workforce Dev.*, 2 N.E.3d 13, 16-17 (Ind. Ct. App. 2013) (finding appellant's argument waived for failure to provide cogent argument).

the UBL.[2] Administrative entities are creatures of statute and cannot exercise power beyond that given in their creation. *Adkins v. City of Tell City*, 625 N.E.2d 1298, 1302 (Ind. Ct. App. 1993). Thus, in order to address Andrade's argument, we must examine the language of the UBL itself to discern what authority it provided to the Board to act. Statutory interpretation is a question of law reserved to the courts. *City of Kokomo v. Iseminger*, 868 N.E.2d 1169, 1171 (Ind. Ct. App. 2007), *trans. denied.* "If the language of the statute is clear and unambiguous, it is not subject to judicial interpretation." *Id.* In other words, an appellate court must give an unambiguous statute its clear and plain meaning. *McCabe v. Commissioner, Indiana Dep't of Ins.*, 949 N.E.2d 816, 819 (Ind. 2011).

[18] The UBL provides a statutory framework for a city, town, or county to address unsafe buildings. I.C. § 36-7-9 *et seq.* The UBL defines an unsafe building one that is

> (1) in an impaired structural condition that makes it unsafe to a person or property;
>
> (2) a fire hazard;

---

[2] The City argues that Andrade waived the issue of whether this matter was governed by the UBL, but it does not argue that Andrade waived his claim that the Board acted in excess of its statutory authority provided by the UBL.

(3) a hazard to the public health;

(4) a public nuisance;

(5) dangerous to a person or property because of a violation of a statute or ordinance concerning building condition or maintenance; or

(6) vacant or blighted and not maintained in a manner that would allow human habitation, occupancy, or use under the requirements of a statute or an ordinance[.]

I.C. § 36-7-9-4(a). The statute is written in the disjunctive, meaning that a building may be considered unsafe if it falls into any one of the six categories listed in the statute. *See Bourbon Mini-Mart, Inc. v. Commissioner, Indiana Dep't of Envtl. Mgmt.*, 806 N.E.2d 14, 20 (Ind. Ct. App. 2004) (noting that "or" is a function word to indicate an alternative).[3] If a premises is unsafe under Section 4, the UBL provides that the enforcement authority may issue an order requiring action relative to the unsafe premises, including, in relevant part:

(1) vacating the unsafe building;

---

[3] After Appellees filed their brief but before Andrade's Reply brief was due, the court handed down *City of Charlestown v. Charlestown Pleasant Ridge Neighborhood Ass'n Corp.*, No. 10A01-1712-CT-2896, 2018 WL 4290649, slip op. at *4-6 (Ind. Ct. App. Sept. 10, 2018), which concerned interpretation of subsection (5) relating to buildings which are deemed unsafe due to a statutory or ordinance violation, which is only one of the six enumerated conditions which can cause a building to be considered unsafe under the UBL.

* * *

(6) demolition and removal of part of an unsafe building.

I.C. § 36-7-9-5(a). Thus, the enforcement authority may order the unsafe building to be vacated and partially demolished and removed.

[19] Here, the Board entered an order granting the City's request that the four unsafe apartments in the Home be removed. That process would necessitate the vacating, demolition, and removal of the unsafe apartments, all of which would effectively return the Home to a single-family home. Thus, the action ordered by the Board falls squarely within the ambit of the UBL's unambiguous provisions.

[20] In addition, we cannot agree with Andrade's characterization of the Board's order, as affirmed by the trial court, as one which sought to "merely enforce the Hammond Zoning Ordinance." (Appellant's Br. p. 16). Both Notices of Violation were issued pursuant to the UBL, not local zoning ordinances. The 2016 Notice alleged twelve groupings of impaired structural conditions, eleven groupings of fire hazards, and six groupings of statute or ordinance violations that did not pertain to zoning, so Andrade's contention that the City only asserted zoning ordinance violations as the basis for its enforcement action is factually incorrect. The Board exhibited no indication at the hearing in this matter that it acted under any other authority apart from the UBL. In its decision, the Board made detailed findings regarding conditions in the Home which rendered it unsafe under the UBL, including that the Home had impaired

structural conditions and fire hazards. Findings and conclusions made by the Board that the Home was not a legal, non-conforming use or that the Home did not conform to current zoning laws may have been pertinent to explaining the history of how the Home came to be unsafe, but they did not convert this matter from one addressing unsafe conditions in the Home into a zoning enforcement action.

[21] We also note that Andrade's arguments on appeal are somewhat inconsistent with his counsel's acknowledgement at the Board hearing that the proceedings were based on the UBL and with his request that the Board focus on Andrade's contention that the Home was constructed as a multi-family structure. Andrade's counsel made it clear to the Board that the Home would no longer be profitable to Andrade if it were declared a single-family home. The Board's reference in its decision to the fact that the home was zoned for two units was pertinent to addressing that concern. Because the UBL provided the authority for the action ordered by the Board and the Board did not make any impermissible findings to support that action, we conclude that the Board did not exceed its statutory authority when it ordered Andrade to restore the Home to a single-family dwelling.

### III. *Sufficiency of the Evidence Supporting the Board's Order*

[22] Andrade challenges the Board's finding, as upheld by the trial court, that the Home was constructed as a single-family home.[4] Andrade contends that "[t]he Board's Order is without substantial evidence and not in accordance with law" because he met his burden of proof to show that the Home was constructed as a multi-family unit. (Appellant's Br. p. 19). Andrade's argument on this point is based upon his erroneous assertion that the Board acted as a zoning enforcement entity and that proof that the Home was originally built as a multi-family structure would bar the Board's order that he restore the Home to a single-family home.

[23] We agree with Appellees that this argument is misplaced, because the UBL provides that any order issued to address an unsafe building "supersedes any permit relating to *building or land use*, whether that permit is obtained before or after the order is issued." I.C. § 36-7-9-5(a) (emphasis added). Thus, for purposes of the UBL, it is of no moment how the property was originally built or zoned.

[24] Nevertheless, we will address the merits of Andrade's argument.[5] Evidence was presented to the Board that the home was originally issued a building permit in

---

[4] Because Andrade only challenges that sufficiency of the evidence supporting these specific findings and not the Board's findings and conclusion regarding the actual unsafe conditions in the Home, we do not address the totality of the evidence supporting the Board's decision as upheld by the trial court.

[5] Inasmuch as Andrade raises a claim of impropiety or bias on the part of one of the Board members, we find that this argument was not raised at the trial court level and, therefore, is waived for our review.

1927 for a nine-room frame, which indicated to Kearney that the home was built as a single-family home. The original building permit issued for the Home did not note that there would be apartments there, which Kearney indicated would typically have been noted if it were to be built as a multi-family structure. Koch testified that the Home did not have any structural elements typical of a multi-family structure built in 1927. Koch found the home comparable to many other single-family homes in the area built around 1927, and he expressed his opinion that the Home was built in 1927 as a single-family home. In light of this evidence that supports the Board's findings as affirmed by the trial court, we cannot say that the trial court's conclusion that the home was built in 1927 as a single-family home was clearly erroneous. *Foursquare Tabernacle*, 630 N.E.2d at 1386. Andrade simply directs our attention to evidence in the record that does not support the Board's and the trial court's conclusions, which is unpersuasive given that we do not substitute our judgment for that of the Board or redetermine the facts of the case. *Kollar*, 695 N.E.2d at 619.

## IV. *Discovery Violation*

Andrade's final argument is that the Board's order should be reversed because the City did not comply with his subpoena *duces tecum*, which he claims resulted in his inability to cross-examine the City's experts, Koch and Kearney.[6] As a

---

*See Kollar*, 695 N.E.2d at 622 ("A party may only obtain judicial review of issues that were properly raised to the trial court.").

[6] The portion of Andrade's argument based on Indiana

result of this non-compliance, Andrade contends that the "Board's decision was made without observance of procedure required by law." (Appellant's Br. p. 23). At the outset, we note that, contrary to Andrade's assertion on appeal, the trial court did not find that he had been "wholly precluded" from cross-examining the City's expert witnesses. (Appellant's Br. p. 25). Rather, the trial court found that the City's non-compliance merely had precluded Andrade from cross-examining the experts regarding their opinion that the Home did not meet the standards of the 1927 building code for multi-family dwellings.

[26] Pretrial discovery is meant to promote the interests of justice and prevent *unfair surprise* by allowing the defense adequate time to prepare. *Jacobs v. State*, 640 N.E.2d 61, 66 (Ind. Ct. App. 1994) (emphasis added), *trans. denied*. As a general matter, the proper remedy for a discovery violation is a continuance. *Warren v. State*, 725 N.E.2d 828, 832 (Ind. 2000). A failure to request a continuance upon moving to exclude evidence constitutes a waiver of any alleged error pertaining to noncompliance with a discovery order. *Id*. Here, although Andrade objected at the Board hearing on the basis that the City had not complied with his subpoena, he did not request a continuance or seek to exclude either Kearney's or Koch's testimony before the Board. Therefore, we conclude that Andrade has waived his claim.

---

Evidence Rule 705 was not raised to the trial court and is, therefore, waived for our review. *Kollar*, 695 N.E.2d at 622.

[27]     However, even if he had not waived his claim, we would not reverse the Board's decision. This matter commenced in March of 2013. Kearney testified at the first Board hearing on May 14, 2015, and the Lake County Superior Court remanded the matter for further proceedings on June 23, 2016, almost six months before the second hearing before the Board on January 12, 2017. In addition, Andrade deposed Koch on at least one occasion during the pendency of this matter. Despite being aware of the substance of Kearney's opinions, at no time did Andrade seek an order that the City comply with his subpoena or request that the Board exclude Kearny's or Koch's testimony or seek a continuance when the matter of the City's non-compliance came up during the January 12, 2017, hearing. Andrade provides us with no authority for his apparent proposition that the Board had an obligation, *sua sponte*, to enforce his discovery request. Given the length of time that Andrade was aware of the City experts' opinions and his failure to seek a remedy before or during the hearing in this matter, we conclude that Andrade was not unfairly surprised by the City's failure to comply with his subpoena.

[28]     In addition, in his subpoena Andrade sought material relied upon by Kearney to form opinions relevant to iron support beams, rear stairway conditions, ceiling heights, electric meters, balloon framing, and basement window height. In its decision the Board found that the Home's chimney chase, inadequate fire separation among the floors of the Home, the lack of basement bedroom windows, and inadequate smoke detectors were all conditions that rendered the Home unsafe under the UBL. Those conditions had nothing to do with the

materials sought by Andrade in his subpoena, and Andrade does not claim his ability to cross-examine the experts on those matters was limited. As a result, we find that the trial court's decision to uphold the Board's order, despite the City's lack of compliance with Andrade's subpoena, was not clearly erroneous. *Foursquare Tabernacle Church*, 630 N.E.2d at 1386.

# CONCLUSION

[29] Based on the foregoing, we conclude that the Board did not exceed its statutory authority when it ordered Andrade to restore the Home to a single-family dwelling. We also conclude that the Board's finding, as upheld by the trial court, that the Home was constructed as a single-family dwelling was supported by substantial evidence. Lastly, we conclude that the City's failure to comply with Andrade's discovery request does not merit reversal.

[30] Affirmed.

[31] Vaidik, C. J. and Kirsch, J. concur