

FILED

Sep 14 2020, 9:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Kevin W. Betz
Sandra L. Blevins
Courtney E. Endwright
Betz + Blevins
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Frances Barrow
Benjamin M.L. Jones
Deputy Attorneys General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Molly Ann Melton, <br> *Appellant-Plaintiff,* <br><br> v. <br><br> Indiana Athletic Trainers Board, et al., <br> *Appellee-Defendants,* | September 14, 2020 <br><br> Court of Appeals Case No. 19A-CT-1972 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Gary L. Miller, Judge <br><br> Trial Court Cause No. 49D03-1704-CT-16808 |

**Robb, Judge.**

## Case Summary and Issues

[1] After Molly Melton's athletic trainer's license was suspended by the Indiana Athletic Trainers Certification Board (the "Board") for conduct that violated the standards of professional practice, she filed a complaint seeking judicial review of the Board's sanction decision and asserting claims under 42 U.S.C. § 1983 ("Section 1983") for alleged violations of her constitutional rights in the disciplinary process. Her complaint named the Board, the Indiana Professional Licensing Agency ("IPLA"), and the five members of the Board at the time of the disciplinary decision in their official and individual capacities ("Members," and collectively with the Board and IPLA, the "Defendants"). The trial court heard the judicial review petition first and, finding that Melton had been prejudiced by the agency action, reversed the Board's sanctions order. The Defendants then filed a motion for summary judgment asserting immunity defenses to the Section 1983 claims which the trial court granted. Melton appeals the trial court's grant of summary judgment on her Section 1983 claims; the Board cross appeals the trial court's grant of relief on the petition for judicial review. Concluding the trial court properly granted summary judgment to the Defendants but erred in granting relief on Melton's petition for judicial review, we affirm in part and reverse in part.

## Facts and Procedural History

# I. Background and Prior Proceedings

The Board regulates the practice of athletic trainers within Indiana and is responsible for establishing standards for the practice of athletic training. Ind. Code § 25-5.1-2-6(2)(C). The Board consists of five members appointed by the governor. Ind. Code § 25-5.1-2-2(a). Among other things, the Board has been given the power to conduct hearings, keep records of proceedings, and do all things necessary to properly administer and enforce the law involving licenses for athletic trainers. Ind. Code § 25-5.1-2-6(5). Upon finding an athletic trainer has violated a standard of professional practice, Ind. Code § 25-1-9-4, the Board has authority to impose a range of disciplinary sanctions, including suspension of a practitioner's license, Ind. Code § 25-1-9-9(a).

Melton was a licensed athletic trainer in the State of Indiana from September 20, 2011 until her license expired on December 31, 2012.[1] In August 2012, Melton was hired as an athletic trainer by IU Health Paoli Hospital's Rehab and Sports Medicine Department ("IU Health"). As part of her duties with IU Health, she worked at Paoli Jr. & Sr. High School (the "School"). In November/December of 2012, Melton, then twenty-three years old, began a sexual relationship with an eighteen-year-old male athlete ("C.J.")[2] at the

---

[1] Until 2015, an athletic training license expired on a date established by the Board in each even-numbered year. Ind. Code § 25-5.1-3-4(a) (2006). In 2015, the statute was amended to allow for a three-year renewal cycle ending December 31, 2017, after which a license expired on a date established by the Board in each odd-numbered year. Ind. Code § 25-5.1-3-4(a) (2015). In other words, no athletic training licenses expired in 2016.

[2] C.J. was eighteen when he began treatment with Melton; he turned nineteen during their relationship.

School whom she had been treating for a knee injury. After approximately three weeks, C.J.'s parents discovered the relationship and filed a complaint with the School. Melton initially denied anything inappropriate occurred other than text message exchanges initiated by C.J. that were "words of friendship" and specifically denied there was any physical contact "at all." Appellant's Corrected Appendix ("App."), Volume 3 at 45. Sometime in December 2012, Melton's employment with IU Health was terminated. Melton did not renew her license when it expired at the end of 2012, which would have required only the payment of a renewal fee. Ind. Code § 25-5.1-3-4(b). Her license became invalid on December 31, 2012 by operation of statute and without any action by the Board. Ind. Code § 25-5.1-3-4(c).

[4] On May 10, 2013, the State of Indiana filed an administrative complaint with the Board alleging that Melton had a sexual relationship with an athlete whom she was treating, violating Indiana Code sections 25-1-9-4(a)(5) (for engaging "in a course of lewd or immoral conduct in connection with delivery of services to the public") and 25-1-9-4(a)(11) (for engaging "in sexual contact with an athlete in her care"). App., Vol. 2 at 211. A Board hearing was first held in September 2013, but Melton did not personally appear. Instead, her counsel appeared on her behalf to admit to the factual basis and argue the sanction. The Board deemed this insufficient and issued a notice of proposed default, which Melton opposed. In January 2014, the Board voted unanimously to find Melton in default, and on February 3, issued an order suspending Melton's license for at least seven years.

[5]     Melton filed a complaint in the trial court alleging that the Board, IPLA, and six members of the Board who were involved in the proceedings[3] violated her federal constitutional rights by holding her in default and arguing that she was therefore entitled to damages under Section 1983.[4] The trial court granted the Board's motion for judgment on the pleadings and dismissed Melton's Section 1983 complaint. The Court of Appeals held that the Board's decision to find Melton in default was in error because it "deprived Melton of her opportunity to be heard at a meaningful time and in a meaningful manner[.]" *Melton I*, 53 N.E.3d at 1220 (quotation omitted). We therefore reversed the trial court's order dismissing Melton's complaint and remanded with instructions for the Board to vacate its February 3, 2014 order and hold a hearing on the administrative complaint against her that comports with due process. *Id.* The court offered no opinion on the Board's order on its merits but confined its decision to the conduct of the hearing.

[6]     Following the Court of Appeals' decision, the Board changed the status of Melton's license from "suspended" (due to Board action) to "expired." *See* Transcript of the Evidence, Volume II at 16. This returned the status of

---

[3] Melton's complaint named David Craig, A.T.; Larry Leverenz, A.T.; Scott Lawrance, A.T.; Jennifer VanSickle; John Miller, M.D.; and John Knote, M.D., each in their individual and official capacities, as defendants. *See Melton v. Ind. Athletic Trainers Bd.*, 53 N.E.3d 1210, 1212 (Ind. Ct. App. 2016) ("*Melton I*").

[4] Melton also filed a petition for judicial review of the Board's decision. The trial court dismissed the petition for judicial review for failure to timely file the agency record. *See Melton I*, 53 N.E.3d at 1214. Melton did not challenge that part of the trial court's decision on appeal.

Melton's license to the status it had been in before administrative proceedings were initiated.[5]

## II. Current Proceedings

On February 8, 2017, pursuant to the remand instructions, the Board held an administrative hearing at which Melton appeared in person and by counsel. Melton admitted to the relationship with C.J. and to violating the professional standards of athletic training. Melton said she took responsibility for what occurred but characterized it as "consensual," "embarrassing," a mistake that "ruined everything that I worked for," and explained it happened because she was "lonely" and "naïve." App., Vol. 5 at 65-67. She felt the suspension she had already served was "three years of living in fear of applying for other licenses" that had "impacted [her] greatly" and was "more than enough." *Id.* at 65, 68.

The State offered C.J.'s testimony about the relationship and its effects on him, including that he became estranged from his parents; suffered from stress and anxiety; and had problems at school, academically, athletically, and personally. The State also admitted documents about Melton's performance as an athletic trainer at New Palestine High School during the 2011-12 school year, just prior to being hired by IU Health and assigned to work at the School. The

---

[5] As already noted, *supra* ¶ 3, Melton's license expired by operation of law on December 31, 2012 because she did not take steps to renew it. The administrative complaint was filed in May 2013, and the first administrative action against her license was the Board's February 3, 2014 order suspending her license.

documents included a written reprimand for violating school policy by transporting students in her personal vehicle and a document listing twenty-one instances of unprofessional behavior, including "[e]xtreme texting" with a student after midnight and "[f]lirtatiousness with wrestlers and baseball players." App., Vol. 3 at 130.[6] Both documents about Melton's performance at

---

[6] The entirety of Volume 3 (as well as pages 105-234 of Volume 2, the entirety of Volume 4, and pages 2-108 of Volume 5) of the Appellant's Corrected Appendix is comprised of the agency record. Volume 3 is put together in such a way that it is nearly impossible to navigate. For instance, beginning on page 10, Volume 3 contains the following:

> Page 10: First page of the affidavit of Gary L. Vaughn, Ph.D.
> Pages 11-17: Pages 2-8 of the administrative complaint against Melton in reverse order
> Page 18: Page 1 of Vaughn's Curriculum Vitae ("CV"), ending with the academic position he held from 1992-93
> Page 19: A later page of Vaughn's CV, starting with his position as adjunct faculty from 2003-present
> Page 20: Page 3 of Vaughn's affidavit
> Page 21: Page 2 of Vaughn's affidavit
> Page 22: First page of the administrative complaint against Melton
> Page 23: Copy of "Psychologist Health Service Provider" license for Janine L. Miller
> Pages 24-27: Pages of what appears to be part of a CV with no identifying information and likely in incorrect order
> Page 28: Blank page
> Page 29: Page 2 of 2 of what appears to be an email
> Page 30: Blank page
> Page 31: Page 1 of 2 of an email to Melton
> Page 32: Blank page

All told, there are sixty-five blank pages in the 239-page Volume 3 (the blank pages do bear a page number), and multiple documents appear out of order and/or appear more than once (for instance, the first page of the administrative complaint appears five times).

In short, Volume 3 of the appendix was not put together in a manner calculated to assist the court in any way. (There are also many blank pages from pages 105-234 of Volume 2, but the documents themselves appear to be in a coherent order. Volume 4 and pages 2-108 of Volume 5 do not suffer from these deficiencies because they are entirely comprised of the transcript of the February 8, 2017 Board hearing.) Even if this is the way the agency record was delivered to Melton, we can discern no reason why the documents could not have been placed in an appropriate order before submitting them to this court. *See* Ind. Code § 4-21.5-5-13(e) (concerning transmittal of the agency record to the trial court, stating, "By stipulation of all parties to the review proceedings, the record may be shortened, summarized, or *organized*.") (emphasis

New Palestine had been shared with Melton during her employment at New Palestine, which ended when she was asked to resign. Melton objected to these documents as irrelevant, improper character evidence, and hearsay. *See* App., Vol. 5 at 21, 23. The State defended admission of the documents as relevant to Melton's state of mind because they showed "she was aware boundary issues existed." *Id.* at 21. The Board allowed the documents to be admitted.

[9] Melton offered the affidavits of two psychologists, one of whom opined that Melton would not pose an unreasonable risk of harm to patients and recommended reinstatement of her license, *see* App., Vol. 3 at 79, and the other of whom had "no basis to disagree" with those recommendations after "extensive interview, evaluation, and testing" of Melton, *id.* at 108. Melton also provided the Board with a document described as "research about the relevant sanctions from the [] Board as well as relevant other sanctions by other boards in the state of Indiana, as well as the Indiana Supreme Court." App., Vol. 5 at 88. The State provided the Board, with no objection from Melton, "some teacher cases" regarding sanctions imposed by the Indiana Department of Education for teacher misconduct. *Id.* at 89.

---

added). We also note that the table of contents for the appendix simply states that Volume 3 contains "Administrative Record dated June 26, 2018 (Continued)" beginning on page 2. App., Vol. 1 at 2. Although this is technically true, it does not exactly help us find or identify relevant documents contained therein and if Melton's counsel had taken the time to create a more detailed table of contents for Volume 3, they may have realized that it was in an unacceptable condition. *See* Indiana Rule of Appellate Procedure 50(C) ("The table of contents shall *specifically identify* each item contained in the Appendix, including the item's date.") (emphasis added).

[10] On March 27, 2017, the Board again found that Melton's conduct violated Indiana Code subsections 25-1-9-4(a)(5) and (11). Concluding, *inter alia*, that C.J., his family, and the School suffered "significant harm" from Melton's actions, App., Vol. 2 at 123, that Melton "did not acknowledge the potential for pain and suffering by [C.J. who was] in the inferior position" but simply considered the relationship "a mistake," *id*. at 124-25, and that Melton having sex with C.J. was "more than a mistake" because it was "repeated over and over again," *id*. at 124, the Board placed Melton on indefinite suspension for at least three years from the date of the order. With respect to the sanction, the Board distinguished the previous Board decisions Melton had offered as precedent and instead relied on its own comparisons with Indiana Department of Education decisions relating to teachers accused of sexual acts with students, albeit acknowledging that an athletic trainer is not a teacher. *Id.* at 125-26.

[11] On April 26, 2017, Melton filed in the trial court a petition for judicial review of the Board's March 2017 order under Indiana Code chapter 4-21.5-5 and a complaint alleging violations of Section 1983 naming as defendants the Board, IPLA,[7] and the following five members of the Board in both their official and individual capacities: Daniel Craig, A.T.; Larry Leverenz, A.T.; Scott Lawrance, A.T.; John Knote, M.D.; and John Doherty, A.T. The Section 1983 complaint alleged in Count I that the Board's "final ruling was contrary to Ms.

---

[7] IPLA performs the administrative functions, duties, and responsibilities for the Board. Ind. Code § 25-0.5-5-19.

Melton's Constitutional right, power, privilege and immunity" in that the Board failed to provide "sufficient procedural and substantive due process protections by not providing notice of the basis for her discipline and imposing an arbitrary and capricious sanction" and thereby "exceeded the scope of the authority provided by the Indiana General Assembly." App., Vol. 2 at 65-66. In Count II, the Section 1983 complaint alleged the Board's final ruling retaliated against Melton for her previous successful appeal and the resultant attorney fee award.[8] Id. at 67. In Count III, her petition for judicial review, Melton alleged the Board's order was "arbitrary, capricious, an abuse of discretion, in excess of statutory jurisdiction and authority and unsupported by substantive evidence." Id. at 70. Melton sought reversal of the sanction order, injunctive relief, attorney fees and costs, and a damages award against the Board Members "in their personal capacity to provide compensation for past and future non-pecuniary losses resulting from the unlawful practices complained of[,] including emotional pain, suffering, inconvenience, loss of enjoyment of life and humiliation[.]" Id.

[12] In their answer to the Section 1983 counts,[9] the Defendants asserted as affirmative defenses (among others) that they:

---

[8] Following the first appeal, the trial court entered an order on Melton's petition for attorney fees and costs awarding her $111,498.75 which the Board paid in December 2016. See App., Vol. 2 at 60.

[9] The Defendants did not specifically answer Count III as "[a] petition for judicial review is not a 'complaint' to which an answer is required." App., Vol. 2 at 100 (citing Ind. Code ch. 4-21.5-5).

- violated no clearly established federal constitutional right of which a reasonable person would have known at the time and are entitled to qualified immunity;

- were acting as an adjudicatory body and thus are entitled to absolute immunity;

- in their respective official capacities are not "persons" subject to suit brought under 42 U.S.C. § 1983; and

- in their respective official capacities are not subject to claims for damages.

*Id.* at 101. During the litigation, the parties and the trial court agreed the Section 1983 claims and the petition for judicial review were not dependent on each other and would be managed separately. *See* App., Vol. 5 at 228 (Defendants' Motion to Correct Error from April 9, 2018 Order stating, "When determining how this case should be managed, the Court and all parties agreed that the judicial review and Section 1983 claims were separate and thus should be managed on separate tracks.").[10] The trial court set separate motions and hearing schedules for the two claims.

---

[10] Based on certain motions filed in the trial court and referenced in the Defendants' Motion to Correct Error (but not included in the appendix on appeal), it appears Melton did not disagree with this assertion.

## A. Petition for Judicial Review

[13] In February 2018, the trial court held a hearing on Melton's petition for judicial review, beginning the hearing by stating, "This is set for a petition for review, or at least hearing oral argument on a petition for judicial review of an administrative ruling. We do have some matters set later this year on part of the original complaint that was filed[.]" Tr., Vol. II at 4. Melton agreed that judicial review "would just be against the IPLA and the [Board]" and the Board Members would "not necessarily be defendants." *Id.* at 5. Melton claimed that although the Board had no evidence of her being a danger to anyone, it "ran wild . . . as if it were a criminal matter and she were a predator." *Id.* at 10. And she posited that the Board's use of Department of Education cases as comparators rather than its own decisions was because the Board's own decisions "made the sanction they gave [Melton] seem out of control." *Id.* at 8. At the conclusion of Melton's presentation, the trial court asked, "[W]hat is your ultimate request of this court?" *Id.* at 14. Melton's counsel replied, "My ultimate request of this court, Your Honor, is to reverse the [Board] and enter a remedy against the [Board] and tell the [Board] to stop it. . . . What happened the last time [on remand] was the [Board] and the [State] went off the rails again. They cannot be trusted to fairly adjudicate this matter. . . . Ms. Melton has had more than enough of a sanction. And she deserves to be reinstated. And this court must tell the [Board] specifically the remedy for reinstating her . . . ." *Id.*

[14] For its part, the Board noted that Indiana Code section 25-1-9-13, which requires the Board to "seek to achieve consistency" in imposing sanctions, only requires the Board to explain a significant departure from prior decisions involving similar conduct and argued there is no prior Board decision involving similar conduct. Tr., Vol. II at 19. The Board responded to the trial court's question about what it wanted the court to do by stating, "What I want you to do is affirm the Board's decision." *Id.* at 21. Section 1983 was never mentioned during the hearing, nor were the Board Members.

[15] The trial court subsequently issued its findings of fact and conclusions of law on the petition for judicial review, finding the Board's decision was arbitrary and capricious and without substantial evidence and that the Board violated Melton's constitutional rights:

> 1) *Given that the Board's March 27, 2017 [] Order was arbitrary and capricious as well as without the support of substantial evidence, and because the Board violated Melton's constitutional rights to substantive and procedural due process, free speech without retaliation, and equal protection, reversal of the Board's Order is appropriate in this case.*
>
> 2) [] Melton's petition for judicial review is therefore granted and this matter is remanded to the Board with instructions to reinstate Melton's Indiana athletic trainers license effective as of the date of this Order.
>
> 3) In addition, . . . the Court awards Ms. Melton her reasonable attorneys' fees and expenses associated with the pursuit of this matter under [Section] 1983. . . .

> 4) *A trial related to the determination of Melton's emotional distress damages resulting from these constitutional violations under [Section] 1983 will be held as currently scheduled[.]*

Appealed Order [of April 9, 2018] ("Judicial Review Order") at 14 (emphasis added).[11] On or about April 16, 2018, the Board again changed the status of Melton's license from "suspended" to "expired." *See* App., Vol. 5 at 236.

## B. Section 1983 Claims

On March 25, 2019, the Defendants filed a motion for summary judgment as to Melton's Section 1983 claims alleging that the Board, IPLA, and the Board Members in their official capacities are not "persons" under Section 1983, they are entitled to absolute quasi-judicial and qualified immunity, and claims that the Board Members in their individual capacities violated Melton's constitutional rights fail as a matter of law. *See* App., Vol. 6 at 53-54. Melton responded and claimed the Defendants' motion was "an ill-conceived recapitulation" of their response to the petition for judicial review and that quasi-judicial and qualified immunities were inapplicable to the individual defendants. *Id.* at 121.

The trial court held a hearing on the motion for summary judgment on June 7, 2019. The Defendants began their presentation by stating, "The issue for judicial review has already been decided by this Court. We're here today only

---

[11] Citation to the appealed orders in this case is based on the .pdf pagination.

on [Melton's Section] 1983 claims. Specifically, those claims against the individual Defendants to which [sic] there's been no finding previously in this Court." Tr., Vol. II at 28. The Defendants asserted two kinds of immunity: absolute quasi-judicial immunity and qualified immunity. In doing so, the Defendants acknowledged that neither immunity would affect the Judicial Review Order:

> The only difference here today between the judicial review briefing and this motion for summary judgment is that *these claims are against the individual Defendants*. So in order to find that the individual Defendants violated Ms. Melton's Constitutional rights under Section 1983, the Court would have to make a finding against the individual Defendants and not against the Board in general as was the case in the judicial review proceeding.

*Id.* at 33 (emphasis added). Melton reiterated the Defendants' point that "no immunities apply to judicial review[ so] we are in an argument as to the issues regarding Section 1983." *Id.* at 34. She then argued that quasi-judicial immunity is the exception not the rule and that the balance of the factors to be considered in determining whether there is quasi-judicial immunity weigh against it in this case. Next, Melton argued that "[t]he general presumption . . . is that qualified immunity, not quasi-judicial immunity, applies." *Id.* at 36. However, Melton argued qualified immunity did not apply here because it was "sufficiently clear that every reasonable official would have understood what he's doing violates" Constitutional rights. *Id.* at 39.

[18] On July 26, 2019, the trial court entered its order on the Defendants' motion for summary judgment, concluding:

> 4. *Defendants are entitled to absolute quasi-judicial immunity* from all of Ms. Melton's claims because their actions were adjudicative in nature when they found Ms. Melton's conduct violated Indiana statute and suspended her license.

> 5. [T]he individual Defendants acted in an adjudicative manner. . . . Throughout the proceedings, the individual Defendants had to evaluate the evidence, apply the evidence to the agency regulations, and ultimately determine an appropriate sanction.

> 6. Thus, their role is adjudicatory, as the incident giving rise to Ms. Melton's complaint was an evidentiary hearing, and there is a process for correcting error via the administrative appeals process and judicial review.

> 7. Because of the judicial nature of the individual Defendants' role in this case, they are entitled to absolute immunity and subsequently protected from personal liability. And because the only claims against the Board and [IPLA] are based on the adjudicative actions of the individual Defendants, they too are entitled to absolute immunity.

> 8. There is no evidence that the individual Defendants' conduct is so abusive of the constitutional rights belonging to [Melton] that reasonable officials would know that their conduct was unconstitutional without guidance from the courts.

> 9. Therefore, even if they were not entitled to absolute immunity, *the individual Defendants in their individual capacity are entitled to qualified immunity* and judgment is granted in their favor on Ms. Melton's § 1983 claims.

Appealed Order at 24-25 ("Section 1983 Order") (emphasis added). With respect to its conclusion that the Board Members were entitled to qualified immunity, the trial court specifically refuted each of Melton's claims that the Board Members in their individual capacities violated her constitutional rights: there was no First Amendment violation because she was not retaliated against; there was no procedural due process violation because she was given an opportunity to be heard at a meaningful time and in a meaningful manner; there was no substantive due process violation because "[a]lthough this Court might disagree with the length of the suspension," the suspension "is reasonable, is permitted by Indiana Code, and did not substantially deviate from any other decision with similar facts"; and there was no equal protection violation because Melton did not identify a similarly situated person who was treated differently. *Id.* at 25-26.

[19] The trial court entered summary judgment for all Defendants on Melton's Section 1983 claims and, finding no just reason for delay, entered final judgment on Melton's complaint.

# Discussion and Decision

## I. Summary of Issues to be Decided

[20] We begin by summarizing the issues to be decided in this appeal and the interplay between them. Melton brought two separate claims in one complaint: 1) a petition for judicial review of the Board's March 27, 2018 order and 2) Section 1983 claims for damages arising out of the Board proceedings. The

caption of Melton's complaint indicates that she named as defendants in her lawsuit the Board, IPLA,[12] and the five members of the Board who participated in the March 2017 sanctions order in their official and individual capacities. Melton referred to all defendants collectively as "the Athletic Board," App., Vol. 2 at 53, and both the Section 1983 claims and the allegations in the petition for judicial review were made against "the Athletic Board," *see id.* at 65-70. The trial court granted Melton relief on the petition for judicial review and ordered that the Board reinstate her license and then granted summary judgment to the Defendants on the Section 1983 claims. Melton claims the Section 1983 Order "reached opposite conclusions from the same trial court's [Judicial Review Order] without further evidence or new arguments." Brief of Appellant at 31. And at first glance, these decisions do seem contradictory, as the trial court explained in great detail in the Judicial Review Order how the Board violated Melton's constitutional rights in issuing the order suspending her license and then found there were no constitutional violations in ruling for the Defendants in the Section 1983 Order. However, this apparent contradiction can easily be reconciled, as the parties themselves acknowledged in the proceedings below that the two components of the complaint were separate and the outcome of one component did not necessarily dictate the outcome of the other.

---

[12] IPLA is named in the caption of the complaint but was not included in the section of the complaint titled "Parties." App., Vol. 2 at 55-56.

[21]    Both the petition for judicial review and the Section 1983 claims raised constitutional issues, but they did so in different postures. The petition for judicial review addressed the *agency action*, and the trial court found, among other things, that the Board's decision was contrary to Melton's constitutional rights, which is a reason for granting relief on judicial review. Accordingly, the trial court reversed the Board's order and remanded for reinstatement of Melton's license. But as will be discussed in greater detail below, only the Board Members are "persons" amenable to a suit under Section 1983. Thus, the Section 1983 claims of constitutional violations are applicable to the *individual actions* of the Board Members. The trial court determined the individual defendants were entitled to absolute quasi-judicial immunity and also to qualified immunity because *as individuals*, they did not violate Melton's constitutional rights. Therefore, the trial court granted summary judgment to the Defendants on the Section 1983 claims. Because the two prongs of Melton's complaint were addressed to different actions by different defendants, there is no contradiction in the trial court's orders.

[22]    But even if there was a contradiction in the trial court's rulings, it would be irrelevant because of our standard of review. For both petitions for judicial review and motions for summary judgment, our standard of review is de novo, and we are not bound by the trial court's findings in either situation. Thus, in Melton's appeal of the Section 1983 Order, we must decide based on our own review of the designated evidence if the Defendants are entitled to summary judgment, and in the Board's appeal of the Judicial Review Order, we must

decide based on our own review of the agency record if Melton is entitled to relief from the Board decision. It just so happens that in this case, the agency record and the evidence designated for summary judgment are one and the same.

# II. Melton's Appeal:
# Section 1983 Order

[23] Melton appeals the trial court's Section 1983 Order claiming that "because [the Board's] individual members are not absolutely immune, and a reasonable factfinder could conclude that [the Board] violated Melton's constitutional rights in multiple ways," the trial court's grant of summary judgment to the Board should be reversed. Br. of Appellant at 29-30.

## A. Standard of Review

[24] When reviewing the grant or denial of summary judgment, we apply the same test as the trial court: summary judgment is appropriate only if the designated evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Sedam v. 2JR Pizza Enters., LLC*, 84 N.E.3d 1174, 1176 (Ind. 2017). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). The moving party bears the

initial burden of showing the absence of any genuine issue of material fact as to a determinative issue. *Id.*

Our review is limited to those facts designated to the trial court, T.R. 56(H), and we construe all facts and reasonable inferences drawn from those facts in favor of the non-moving party, *Meredith v. Pence*, 984 N.E.2d 1213, 1218 (Ind. 2013). Because we review a summary judgment ruling de novo, a trial court's findings and conclusions offer insight into the rationale for the court's judgment and facilitate appellate review but are not binding on this court. *Denson v. Estate of Dillard*, 116 N.E.3d 535, 539 (Ind. Ct. App. 2018). Additionally, we are not constrained by the claims and arguments presented to the trial court, and we may affirm a summary judgment ruling on any theory supported by the designated evidence. *Id.*

## B. Section 1983

Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the *deprivation of any rights, privileges, or immunities secured by the Constitution* and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (emphases added). Section 1983 creates no substantive rights of its own but was "designed to prevent the states from violating the [C]onstitution . . . and to compensate injured plaintiffs for deprivations of those

federal rights." *Culver-Union Twp. Ambulance Serv. v. Steindler*, 629 N.E.2d 1231, 1233 (Ind. 1994). To prevail on a Section 1983 claim, "the plaintiff must show that (1) the defendant deprived the plaintiff of a right secured by the Constitution and laws of the United States, and (2) the defendant acted under the color of state law." *Myers v. Coats*, 966 N.E.2d 652, 657 (Ind. Ct. App. 2012) (quotation omitted). But before evaluating a plaintiff's claim, it is necessary to determine whether a particular defendant is a "person" within the meaning of the statute and thus, amenable to suit. *Severson v. Bd. of Trustees of Purdue Univ.*, 777 N.E.2d 1181, 1188 (Ind. Ct. App. 2002), *trans. denied*.

[27] There are three factors to be considered in determining whether a particular entity is a "person" for Section 1983 purposes. *Ross v. Ind. State Bd. of Nursing*, 790 N.E.2d 110, 117 (Ind. Ct. App. 2003). First, the type of governmental entity being sued. *Id.* The United States Supreme Court has held that for Section 1983 purposes, the term "person" does not include a state or its administrative agencies. *Crouch v. State*, 147 N.E.3d 1026, 1030 (Ind. Ct. App. 2020) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989)); *see also Howlett by & through Howlett v. Rose*, 496 U.S. 356, 365 (1990) (explaining that *Will* established that "the State and arms of the State, which have traditionally enjoyed Eleventh Amendment immunity, are not subject to suit under § 1983 in either federal court or state court."). Second, whether the plaintiff seeks retrospective (monetary) or prospective (injunctive) relief. *Ross*, 790 N.E.2d at 117. And third, whether the suit is brought against a state official in an official or individual capacity. *Id.* Based on these factors, five general rules have

emerged regarding whether an entity is a "person" within the meaning of Section 1983:

> 1) a municipality, municipal official, or other local governmental unit or political subdivision may be sued for retrospective or prospective relief; 2) a state or state agency may not be sued under section 1983 regardless of the type of relief requested; 3) a state official cannot be sued in his official capacity for retrospective relief but can be sued for prospective relief; 4) a state official can be sued in his individual capacity for retrospective relief; and 5) an entity with Eleventh Amendment immunity in federal court is not considered a section 1983 "person" in state court.

*Id.* With those rules in mind, we consider whether each of the defendants named by Melton is a "person" for Section 1983 purposes.

### 1. IPLA and the Board

[28] There can be little doubt that IPLA and the Board are state agencies, and the parties do not dispute this. IPLA and the Board are both created by statute. *See* Ind. Code § 25-1-5-3(a) (establishing IPLA) and Ind. Code § 25-5.1-2-1 (establishing the Board). The executive director of IPLA and the members of the Board are appointed by the governor. *See* Ind. Code § 25-1-5-5(a) (stating "[IPLA] shall be administered by an executive director appointed by the governor") and Ind. Code § 25-5.1-2-2(a) (stating the Board "consists of five (5) members appointed by the governor"). IPLA performs all administrative functions, duties, and responsibilities for the Board. Ind. Code § 25-0.5-5-19. As state agencies, neither IPLA nor the Board may be sued as a "person" under

Section 1983 regardless of the relief requested. *See Ross*, 790 N.E.2d at 117 (deciding the same as to the Indiana State Board of Nursing and the Health Professions Bureau, which at the time *Ross* was decided served the same function for the Board of Nursing that IPLA now does). Therefore, summary judgment for IPLA and the Board on Melton's Section 1983 claims was appropriate.

## 2. Board Members

[29] The amenability of the Board Members to a Section 1983 suit is at the heart of Melton's appeal. In *Kentucky v. Graham*, the United States Supreme Court offered the following illustration of the basic distinction between individual- and official-capacity actions under Section 1983:

> [Individual]-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent. As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity. Thus, while an award of damages against an official in his [individual] capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.

> On the merits, to establish [individual] liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. More is required in

an official-capacity action, however, for a governmental entity is liable under § 1983 only when the entity itself is a moving force behind the deprivation; thus, in an official-capacity suit the entity's "policy or custom" must have played a part in the violation of federal law. When it comes to defenses to liability, an official in a[n individual]-capacity action may, depending on his position, be able to assert personal immunity defenses . . . . In an official-capacity action, these defenses are unavailable. . . .

. . . A victory in a[n individual]-capacity action is a victory against the individual defendant, rather than against the entity that employs him.

473 U.S. 159, 165-68 (1985) (quotations, citations, emphasis, and footnotes omitted).

### a. Official Capacity

[30]    Because official capacity suits generally state a claim against the entity of which the officer is an agent, state officials sued in their official capacities, like states and state entities, are not generally "persons" subject to suit for damages under Section 1983. *Will*, 491 U.S. at 71. An exception to this general rule exists if the state official is sued in his or her official capacity for prospective relief such as an injunction based on an alleged ongoing constitutional violation. *Chang v. Purdue Univ.*, 985 N.E.2d 35, 49 (Ind. Ct. App. 2013), *trans. denied*.

Under the doctrine of *Ex Parte Young*, 209 US 123, 159 [] (1908), when an official acts in an unconstitutional manner, his actions are stripped of their official cloak, and he may be ordered to perform his official duties in a manner consonant with the Constitution. Under this legal fiction, the state is presumed not to accede to unlawful actions taken by one of its officials, so that

> an order directed to the official to affirmatively correct his actions
> is not being directed against the state. It has consistently been
> held since *Ex Parte Young* . . . that suits may be brought against
> public officials to enjoin them from invading constitutional
> rights.

*Stevens by Stevens v. Ind. Dep't of Pub. Welfare*, 566 N.E.2d 544, 548 (Ind. Ct. App. 1991) (citation omitted), *trans. denied*; *see also Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 294 (1997) (noting that the doctrine of *Ex parte Young* allows official capacity suits "where a plaintiff alleges an *ongoing* violation of *federal* law, and where the relief sought is *prospective* rather than *retrospective*") (O'Connor, J., joined by Scalia and Thomas, JJ., concurring in part and concurring in judgment).

[31] The trial court did not make any specific findings about Melton's official capacity claims, and as noted in *Kentucky v. Graham*, immunity defenses are not available to officials sued in their official capacities, 473 U.S. at 167, so the trial court's general conclusions about immunity do not support summary judgment for the Board Members in their official capacities. In this regard, we agree with Melton that immunity does not bar her request for injunctive relief. *See* Br. of Appellant at 50. Nonetheless, we hold summary judgment is appropriate on grounds other than immunity. *See Denson*, 116 N.E.3d at 539 (stating that we may affirm summary judgment on any theory supported by the evidence).

[32] In *Crouch v. State*, the plaintiff, a former employee of the Indiana Attorney General's office, filed a Section 1983 complaint against the State of Indiana and the State Personnel Director, in both her official and individual capacities, upon

finding out that after his employment was terminated, the State Personnel Department had identified him as not eligible for rehire. Among other things, the plaintiff requested the trial court "[e]njoin the State from categorizing [him] or any other employee as not eligible for rehire without first providing that individual with notice and an opportunity to be heard." 147 N.E.3d at 1030. The trial court dismissed the complaint. On appeal, with respect to the claim against the State Personnel Director in her official capacity, we noted the rule that a state official can be sued in her official capacity for injunctive relief, but determined that the plaintiff's request was to enjoin *the State* from undertaking certain actions. Because the plaintiff did not request any prospective relief as to the *State Personnel Director* in her official capacity, we affirmed the trial court's dismissal of the complaint against her in that capacity. *See id.*

[33]     The same is true here. Melton requested "an award of injunctive relief requiring *the Athletic Board to adopt reasonable procedures* in compliance with their legislatively mandated duties, in as much as the Athletic Board's procedures pose an imminent threat of recurrence of injury[.]" App., Vol. 2 at 70 (emphasis added). Although the fact that Melton uses "the Athletic Board" to refer to all defendants perhaps makes it less obvious than in *Crouch*, Melton's request for injunctive relief concerns the policies and procedures of the Board *as a body* rather than the actions of any one or more Board Members. Melton did not defend her request for official capacity relief at the summary judgment hearing and beyond noting in her brief the general rule that state officials may be sued in their official capacity for prospective relief, does not support her

official capacity claim on appeal. *See* Br. of Appellant at 50. Because Melton did not request injunctive or other prospective relief *as to the Board Members in their official capacity*, the trial court did not err in granting summary judgment to the Board Members in their official capacities.[13]

### b. Individual Capacity

[34] As for the Board Members in their individual capacities, the trial court determined that they were entitled to both absolute quasi-judicial immunity and qualified immunity. When a Section 1983 claim is asserted against a state official in his or her individual capacity, he or she may assert privileges of absolute or qualified immunity. *Bd. of Trustees of Purdue Univ. v. Eisenstein*, 87 N.E.3d 481, 495 (Ind. Ct. App. 2017), *trans. denied*. Melton contends the trial court erroneously granted the Board Members immunity.

[35] "It is well-settled that judges are entitled to absolute judicial immunity for all actions taken in the judge's judicial capacity, unless those actions are taken in the complete absence of any jurisdiction." *Droscha v. Shepherd*, 931 N.E.2d 882, 888-89 (Ind. Ct. App. 2010).[14] "The underlying purpose of the immunity is to preserve judicial independence in the decision-making process." *Id.* at 889. "That same underlying policy justifies granting immunity to non-judicial

---

[13] Even if Melton did state a claim for prospective relief against the Board Members in their official capacities, given our resolution of the petition for judicial review, *infra* Section III, she would not be entitled to that relief.

[14] Melton does not contend the Board acted in the complete absence of jurisdiction.

officers who perform quasi-judicial functions." *D.L. v. Huck*, 978 N.E.2d 429, 433 (Ind. Ct. App. 2012). The United States Supreme Court has extended absolute immunity to certain others who perform functions closely associated with the judicial process. *Cleavinger v. Saxner*, 474 U.S. 193, 200 (1985). But courts are cautious in applying the judicial immunity doctrine to areas outside the traditional adversarial process. *Lake Cnty. Juvenile Court v. Swanson*, 671 N.E.2d 429, 435 (Ind. Ct. App. 1996), *trans. denied*.

[36] In determining whether a person is entitled to the benefit of absolute immunity, we use the functional approach established by the United States Supreme Court and look to the nature of the function performed rather than the identity of the person who performed it. *Mendenhall v. City of Indpls.*, 717 N.E.2d 1218, 1226 (Ind. Ct. App. 1999), *trans. denied*; *see also Forrester v. White*, 484 U.S. 219, 224 (1988); *Cleavinger*, 474 U.S. at 201. The touchstone of the functional approach is "performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights." *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 435-36 (1993) (citation omitted). Therefore, absolute immunity is available to members of a quasi-judicial adjudicatory body when they perform duties functionally comparable to those of judicial officers. *Butz v. Economou*, 438 U.S. 478, 512-13 (1978) (granting absolute immunity to members of the Department of Agriculture adjudicating an administrative complaint).

[37] There are "two overarching scenarios in which the functional approach leads to a grant of immunity." *D.L.*, 978 N.E.2d at 433. The first is where there is a direct adjudication of rights, either by a judge or by someone performing an

action that is functionally equivalent to that of a judge. *Id.* (citing *Snyder v. Nolen*, 380 F.3d 279, 286 (7th Cir. 2004)). The second involves individuals who are carrying out the explicit orders of a judicial officer. *Id.* (citing *Snyder*, 380 F.3d at 287).

[38] To date, it appears Indiana state appellate courts have primarily had occasion to consider the second scenario, in which quasi-judicial immunity has been given to people "performing tasks so integral or intertwined with the judicial process that these persons are considered an arm of the judicial officer who is immune." *H.B. v. State of Ind. – Elkhart Div. of Family & Children*, 713 N.E.2d 300, 302 (Ind. Ct. App. 1999), *trans. denied*. Thus, for example, a probation officer who was acting as an officer of the court in implementing and enforcing an order regarding a child's placement with a foster family was granted quasi-judicial immunity. *J.A.W. v. State*, 650 N.E.2d 1142, 1152 (Ind. Ct. App. 1995), *aff'd*, 687 N.E.2d 1202, 1203 n.3 (Ind. 1997); *see also Thornton v. Pietrzak*, 120 N.E.3d 1139, 1145 (Ind. Ct. App. 2019) (probation officers who filed a notice of probation violation were performing a task integral to the judicial process and were therefore entitled to quasi-judicial immunity as an arm of the judge), *trans. denied*. Likewise, case workers employed by the Department of Family and Children to assist the juvenile court by implementing the court's orders and making recommendations about the placement of children in need of services were granted quasi-judicial immunity. *H.B.*, 713 N.E.2d at 303.

[39] But in this case, we are confronted with the first scenario: whether the Board Members—undisputedly non-judicial officers—were acting in a capacity that is

functionally equivalent to that of a judge. As the Supreme Court has explained, "[w]hen judicial immunity is extended to officials other than judges, it is because their judgments are 'functional[ly] comparab[le]' to those of judges—that is, because they, too, 'exercise a discretionary judgment' as a part of their function." *Antoine*, 508 U.S. at 436 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 423 n.20 (1976)). Whether absolute immunity ought to be afforded is dependent upon the nature of the functions performed by the party in question and "the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions." *Forrester*, 484 U.S. at 224. In adjudicating controversies between parties, judges must be free to render decisions without fear of personal liability for those decisions. *Stump v. Sparkman*, 435 U.S. 349, 363 (1978). "[T]he cloak of immunity is designed to prevent a situation in which decision-makers act with an excess of caution or otherwise . . . skew their decisions in ways that result in less than full fidelity to the objective and independent criteria that ought to guide their conduct out of a fear of litigation or personal monetary liability." *Snyder*, 380 F.3d at 286 (quoting *Tobin for Governor v. Ill. State Bd. of Elections*, 268 F.3d 517, 522 (7th Cir. 2001), *cert. denied*, 535 U.S 929 (2002)).

[40] To decide whether persons performing adjudicatory functions within federal agencies are entitled to absolute immunity for judicial acts, the Supreme Court has considered whether adjudication within a federal administrative agency "shares enough of the characteristics of the judicial process that those who participate in such adjudication should[, like judges,] be immune from suits for

damages." *Butz*, 438 U.S. at 513. The Court identified the following "safeguards built into the judicial process" as "just a few of the many" characteristics of the judicial process that "tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct": the need to assure that the person can perform their functions without harassment or intimidation; insulation from political influence; the importance of precedent; the adversarial nature of the process; and the correctability of error on appeal. *Id.* at 512. Ultimately, the Court determined that the "role of the modern federal hearing examiner or administrative law judge . . . is 'functionally comparable' to that of a judge" because "adjudication within a federal administrative agency shares enough of the characteristics of the judicial process[.]" *Id.* at 512-13.

[41] Melton contends none of the above safeguards except for the adversarial nature of the process are present in this case. We disagree. Accepting as true Melton's assertion that the Board "rarely takes any action[,]" Br. of Appellant at 52, what action it does take is of considerable import to the persons affected and should be performed without fear of harassment or intimidation. "[T]he nature of the adjudicative function requires a judge frequently to disappoint some of the most intense and ungovernable desires that people can have." *Forrester*, 484 U.S. at 226. For example, the First Circuit has recognized that "the act of revoking a physician's license—which bars the physician from practicing medicine in [a given state]—is likely to stimulate a litigious reaction from the disappointed physician, making the need for absolute immunity apparent." *Bettencourt v. Bd.*

*of Registration in Med. of Commonwealth of Mass.*, 904 F.2d 772, 783 (1st Cir. 1990). "[A]bsolute immunity is available to quasi-judicial officers because the threat of being subjected to *any* litigation impedes the officers' ability to engage in independent and fearless decision-making." *Tobin for Governor*, 268 F.3d at 524.

[42]     As for political influence, the Board Members are indeed appointed by the governor. However, "for purposes of immunity analysis, the insulation-from-political-influence factor does not refer to the independence of the government official from the political or electoral process, but . . . to the independence of the government official as a decision-maker." *Id.* at 526 (quoting *Brown v. Griesenauer*, 970 F.2d 431, 439 (8th Cir. 1992)). Thus, in *Tobin for Governor*, the Seventh Circuit concluded that even though members of the Illinois State Board of Elections were appointed by the governor, that was not an impediment to absolute immunity. 268 F.3d at 526. If it were otherwise, state judges who are appointed would not be entitled to absolute immunity. *Cf. id.* There is no indication the governor has any influence over the decisions of the Board.

[43]     Moreover, multiple layers of review of a Board decision are available such that any errors may be corrected through the appellate process. Not only is a Board decision subject to judicial review in the trial court by statute, Ind. Code § 4-21.5-5-1, but also by this court and ultimately, by the Indiana Supreme Court, Ind. Code § 4-21.5-5-16.

As to the importance of precedent, the Board is required by statute to seek consistency in its decision-making and to explain any deviation from prior decisions involving similar conduct. Ind. Code § 25-1-9-13. Even if we accept Melton's position that this is not the same as being "bound by precedent typical of a legal inquiry," Br. of Appellant at 54 (quoting *Flying Dog Brewery, LLLP v. Mich. Liquor Control Comm'n*, 597 Fed. App'x 342, 351 (6th Cir. 2015)), this is the only factor that weighs against quasi-judicial immunity. Along with the adversarial process in place during Board proceedings, *see generally* Ind. Code ch. 4-21.5-3 (describing the conduct of adjudicative proceedings), the safeguards discussed above indicate that there are sufficient checks on malicious action by Board Members.

The Board Members, like a judge, perform a traditional adjudicatory function in that they weigh evidence, decide facts, apply law, choose sanctions, and otherwise resolve disputes on the merits against a backdrop of multiple safeguards designed to protect the licensee's constitutional rights. In similar situations, federal courts have extended quasi-judicial immunity to the individual members of administrative boards who exercise their discretion and issue decisions – duties functionally comparable to those of judicial officers. *See, e.g., Di Ruzzo v. Tabaracci*, 480 Fed. App'x 796, 797 (5th Cir. 2012) (concluding members of the Texas Medical Board were performing quasi-judicial functions with respect to a hearing regarding plaintiff's alleged unlicensed practice of medicine); *Diva's Inc. v. City of Bangor*, 411 F.3d 30, 40-41 (1st Cir. 2005) (concluding members of city council were performing quasi-

judicial functions in denying special amusement permit); *Tobin for Governor*, 268 F.3d at 522 (concluding members of the Illinois State Board of Elections were acting in an adjudicative capacity when they evaluated the validity of a nomination petition); *Wilson v. Kelkhoff*, 86 F.3d 1438, 1443-45 (7th Cir. 1996) (granting absolute immunity to members of a prison review board who revoked a plaintiff's release after a hearing); *Bettencourt*, 904 F.2d at 784 (concluding members of the state medical board were fulfilling a quasi-judicial role in revoking a physician's license to practice medicine); *Horowitz v. Bd. of Med. Exam'rs of State of Colo.*, 822 F.2d 1508, 1515 (10th Cir. 1987) (granting absolute immunity to medical board members who performed both adjudicatory and prosecutorial functions), *cert. denied*, 484 U.S. 964 (1987).

[46] Even accepting as true all of Melton's allegations about the Board's "out of bounds, unjustified and senseless" actions, *see* Br. of Appellant at 28, the trial court's decision that the Board Members were entitled to absolute immunity was proper. Such immunity totally insulates officials from liability for actions taken in their judicial or quasi-judicial capacity; the shield of absolute immunity cannot be pierced even if the official acts in error, maliciously, or corruptly. *Stump*, 435 U.S. at 356 & 359.

[47] Although quasi-judicial immunity has not previously been extended by Indiana state courts to members of a professional licensing board, given the nature of the functions performed by the Board Members in deciding whether Melton violated the standards of professional practice and what sanction should be imposed therefor, and considering the federal cases that have granted quasi-

judicial immunity to officials in similar circumstances, we see no reason why quasi-judicial immunity should not be extended to the members of this professional licensing board.[15] *Cf. Eisenstein*, 87 N.E.3d at 497 (granting absolute quasi-judicial immunity to university chancellor who was acting in a quasi-judicial role in investigating, conducting a hearing, and determining whether a violation of university policy had occurred).

[48]  In sum, IPLA and the Board itself are not amendable to a Section 1983 suit. The Board Members in their official and individual capacities are "persons" for purposes of Section 1983, but 1) the Board Members in their official capacities can only be sued for prospective relief and Melton's request for an injunction is directed to prospective action by the Board and 2) the Board Members in their individual capacities are absolutely immune because they were performing a quasi-judicial function in hearing the disciplinary case and determining a sanction.[16]  Accordingly, we hold the trial court did not err in granting summary judgment to the Defendants on Melton's Section 1983 claims.

---

[15] Given this resolution on the issue of absolute quasi-judicial immunity, we need not address whether the Board members had qualified immunity.

[16] Melton contends that even if applicable otherwise, quasi-judicial immunity does not apply to the Board's administrative actions in failing to void a report of her suspension to the National Practitioner Data Bank ("NPDB") and failing to alter its meeting minutes from the February 2017 hearing after the trial court's Judicial Review Order.  The allegations in Melton's complaint about the Board *making* a report to the NPDB were raised in the context of supporting her retaliation claim and she made no allegations about the Board's failure to *void* the report.  *See* App., Vol. 2 at 65, ¶ 51.  She also made no allegations about failure to alter the meeting minutes in her complaint.  We therefore decline to address liability for these allegedly non-judicial actions.  *See Cavens v. Zaberdac*, 849 N.E.2d 526, 533 (Ind. 2006) ("Issues not raised to the trial court are waived on appeal.").

# III.  Board's Cross-Appeal:
# Judicial Review Order

On cross-appeal, the Board contends the trial court improperly granted Melton's petition for judicial review because the Board's decision was supported by substantial evidence, the sanction was not arbitrary and capricious or an abuse of discretion, and the Board did not violate Melton's constitutional rights.

## A.  Standard of Review

Under the Administrative Orders and Procedures Act, a court may grant relief only if it determines that a person seeking judicial review has been prejudiced by an agency action that is:

> (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (2) contrary to constitutional right, power, privilege, or immunity;
> (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (4) without observance of procedure required by law; or
> (5) unsupported by substantial evidence.

Ind. Code § 4-21.5-5-14(d).

A trial court and an appellate court review the decision of an administrative agency with the same standard of review. *Ind. Family & Social Servs. Admin. v. Patterson*, 119 N.E.3d 99, 105 (Ind. Ct. App. 2019), *trans. denied*, *cert. denied*, 140 S.Ct. 667 (2019).  In other words, in reviewing the decision of an administrative

agency, we are limited to determining whether the *agency's* decision is supported by substantial evidence and whether the *agency's* action is arbitrary and capricious, an abuse of discretion, or in excess of statutory authority. *Davis v. Ind. State Bd. of Nursing*, 3 N.E.3d 541, 548 (Ind. Ct. App. 2013). Thus, it is the agency's decision that we review, not the trial court's. We may not try the facts *de novo* or substitute our own judgment for that of the agency; rather, we defer to the agency's findings if they are supported by substantial evidence, *Jay Classroom Teacher's Ass'n v. Jay Sch. Corp.*, 55 N.E.3d 813, 816 (Ind. 2016), and consider the record in the light most favorable to the agency's decision, *Ind. State Ethics Comm'n v. Sanchez*, 18 N.E.3d 988, 992 (Ind. 2014). We review an agency's conclusions of law *de novo* but give great weight to the agency's interpretation of the law. *Patterson*, 119 N.E.3d at 105. We will not reverse simply because we may have reached a different result. *Behavioral Health and Human Servs. Licensing Bd. v. Williams*, 5 N.E.3d 452, 459 (Ind. Ct. App. 2014), *trans. denied*.

[52] The "burden of demonstrating the invalidity of agency action is on the party to the judicial review proceeding asserting invalidity[,]" Ind. Code § 4-21.5-5-14(a), and that is true at both the trial and appellate levels, *Sanchez*, 18 N.E.3d at 991 n.1 (rejecting claim by judicial review petitioner that because she prevailed in the trial court, the agency had the burden of proof on appeal).

## B. Review of the Board's Order

[53] The Board concluded that Melton had committed two violations of the standards of professional practice under Indiana Code section 25-1-9-4. Melton does not, and indeed could not, challenge that conclusion, inasmuch as she admitted during the Board hearing in February 2017 that she violated the professional standards by having a sexual relationship with a patient. *See* App., Vol. 5 at 65. That conclusion is therefore supported by substantial evidence. Pursuant to Indiana Code section 25-1-9-9, if the Board finds that the licensee is subject to disciplinary sanctions for, among other things, violating professional standards, it may impose any one or more of the following sanctions: permanent revocation of a license, suspension of a license, censure, reprimand, probation, or assessment of a fine. Ind. Code § 25-1-9-9(a)(1)–(6). Upon concluding Melton violated the professional standards of conduct and considering evidence offered at the hearing about an appropriate sanction, the Board suspended Melton's license indefinitely but for "no less than three (3) years[.]" App., Vol. 2 at 127.[17]

[54] Melton sought judicial review arguing not about the Board's conclusions regarding her conduct, but about the process by which the Board determined a

---

[17] We agree with the Board that "[b]ecause the final order was entered March 27, 2017, the three-year period [ended] on March 27, 2020." Brief of Appellees/Cross-Appellants at 31. But to the extent the Board implies by this that Melton's *suspension* ended on March 27, 2020, we cannot agree. Because of the "indefinite suspension" and "no less than three years" language, Melton's suspension did not *necessarily* end on March 27, 2020. It *could* have ended as early as March 27, 2020 but could also extend beyond that date. The Board's decision does not indicate on what terms the suspension would be lifted after the expiration of three years.

sanction as well as the length of the sanction itself. Her petition alleges that the Board violated her procedural due process rights (by referencing allegations of flirting in her previous job and using sanction decisions by the Indiana Department of Education in reaching its decision, neither of which she was provided notice of in advance), substantive due process rights (by imposing an "out of bounds" sanction and failing to give her credit for the suspension she had already served), equal protection rights (by treating her differently than other athletic trainers), and First Amendment rights (by retaliating against her for her earlier appeal). *See* Reply of Appellant and Brief of Cross-Appellee at 25. She also argued the sanction was in excess of the Board's statutory authority and without observance of procedure required by law because it "far exceeded the bounds of proportionality to other decisions" by the Board without adequate explanation, Br. of Appellant at 41, and further argued the decision was arbitrary and capricious and unsupported by substantial evidence.

### 1. *Contrary to Constitutional Right*

#### a. *Procedural Due Process*

[55] Melton argues she was denied procedural due process because she was deprived of notice that the "flirting" allegations from her prior job would be considered and also deprived of notice that the Board would consider Indiana Department of Education disciplinary cases offered by the State as comparators. *See* Br. of Appellant at 42. Generally stated, due process requires notice, an opportunity to be heard, and an opportunity to confront witnesses. *Ind. State Bd. of Educ. v. Brownsburg Cmty. Sch. Corp.*, 842 N.E.2d 885, 889 (Ind. Ct. App. 2006). The

notice must be reasonably calculated, under all the circumstances, to offer the interested parties an opportunity to present their objections. *Id.* "Such notice must reasonably convey the required information to the affected party, must afford a reasonable time for that party to respond, and is constitutionally adequate when the practicalities and peculiarities of the case are reasonably met." *Id.* (citation omitted).

[56]    In the case of *In re M.L.K.*, 751 N.E.2d 293 (Ind. Ct. App. 2001), the appropriate scope of this notice was discussed. Parents received notice that the trial court would hold a hearing regarding the State's request to terminate wardship of their child. At the hearing, the issue of the parents' obligation to reimburse the State for amounts it had expended in care of the child was also addressed and following the hearing, the trial court entered an order terminating the wardship and also ordering the parents to reimburse the State over $20,000. Parents appealed, arguing their due process rights were violated because they did not have notice that reimbursement would be an issue at the hearing. We agreed, noting:

> A party is entitled to some notice that an issue is before the court which has not been pleaded or has not been agreed to in a pre-trial order. This is especially true where the new issue is not unequivocally clear by the evidence being submitted. This is not being technical. This is being fair. A party should be given an opportunity to meet the issues which the court is considering.

*Id.* at 296-97 (quoting *Aldon Builders, Inc. v. Kurland*, 152 Ind. App. 570, 580, 284 N.E.2d 826, 832 (1972)); *see also Brownsburg Cmty. Sch. Corp.*, 842 N.E.2d at 891-

92 (holding that where school petitioned for judicial review of a State Board of Education order and the trial court held a "preliminary hearing" on a motion to stay that order but then ruled on the merits of the petition for judicial review based on that hearing, the Board of Education was not afforded sufficient notice that the hearing would be its only chance to argue the case on the merits).

[57] The "notice" Melton claims she was denied is not of this dimension. The February hearing addressed whether Melton's conduct violated the standards of professional practice as alleged by the administrative complaint and if so, what sanction was appropriate. Nothing that happened at the hearing was outside those bounds. The Board did not "substantively consider[]" and find that Melton violated a standard of professional practice by flirting with student athletes at New Palestine as Melton alleged in her complaint.[18] *See* App., Vol. 2 at 61, ¶ 34. To the contrary, the Board did not find that these allegations were true at all. Instead, the Board found that Melton "received an evaluation from the New Palestine athletic director *alleging* [she] was flirtatious with wrestlers and football players." *Id.* at 82 at ¶ 40 (emphasis added). Thus, the Board acknowledged they were only allegations and considered them as part of the fullness of the circumstances relevant to an appropriate sanction; that is, the Board considered that a prior employer had expressed concerns to Melton that she was not observing appropriate student/trainer boundaries even before she

---

[18] Had the Board found Melton violated a standard of professional practice by flirting with student athletes at New Palestine, this *would* have been a due process notice issue because the administrative complaint only referenced her conduct with C.J. while employed by IU Health.

began a relationship with C.J. Melton was advised of those allegations during her prior employment and had an opportunity to respond to them during the hearing. The flirting allegations were not a *new* issue sprung upon Melton at the February hearing; they were simply evidence relevant to a *known* issue. Melton's right to procedural due process was not violated by this evidence.

[58]  As for the Department of Education disciplinary cases, Melton was not deprived of notice that the Board would consider these cases. Before closing her evidence, Melton offered "research about the relevant sanctions from the Athletic Trainers Board as well as relevant other sanctions by other boards in the state of Indiana, as well as the Indiana Supreme Court." App., Vol. 5 at 88. The State then stated its desire to offer "some teacher cases" and Melton replied, "Fair enough. No objection." *Id.* at 89.[19] Thus, Melton knew and consented to Department of Education disciplinary cases being available to the Board. Moreover, these cases, as well as the cases provided by Melton, are akin to legal research, not evidence, and the Board would have been entitled to do research after the hearing and find these cases on its own without providing notice to the parties.

[59]  "It is commonly understood that procedural due process includes notice and an opportunity to be heard." *D.L.D. v. L.D.*, 911 N.E.2d 675, 679 (Ind. Ct. App.

---

[19] Melton argued in her closing argument why the Department of Education cases should not apply, *see* App., Vol. 5 at 103-04, but she did not object when they were offered.

2009), *trans. denied*. Melton was provided those safeguards during the Board proceedings and therefore her right to procedural due process was not violated.

### b. Substantive Due Process

[60] Melton's petition for judicial review alleged the Board violated her substantive due process rights by imposing an "out of bounds" sanction, including that the sanction was not proportional to other Board decisions, was not adequately explained, and did not give her credit for the suspension she had already served. App., Vol. 2 at 54, 69.

[61] Substantive due process bars certain government actions "regardless of the fairness of the procedures used to implement them[.]" *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (citation omitted); *see also N.B. v. Sybinski*, 724 N.E.2d 1103, 1112 (Ind. Ct. App. 2000) ("Substantive due process ensures that state action is not arbitrary or capricious regardless of the procedures used."), *trans. denied*.[20] "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). But "only the most egregious official conduct can be said to be

---

[20] The Board argues that because Melton raised procedural due process, equal protection, and First Amendment claims, she cannot raise a more general substantive due process claim. *See* Br. of Appellees/Cross-Appellants at 44-45. Where a particular Amendment provides "an explicit textual source of constitutional protection" against a particular sort of government behavior, "that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Graham v. Connor*, 490 U.S. 386, 395 (1989). However, that is true only if a claim is covered by a specific amendment. *U.S. v. Lanier*, 520 U.S. 259, 272 n.7 (1997). We agree with Melton that her specific substantive due process claims do not merely restate her procedural due process, equal protection, or First Amendment claims and are not precluded by the rule announced in *Graham.*

'arbitrary in the constitutional sense.'" *Cnty. of Sacramento*, 523 U.S. at 846 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992)). The United States Supreme Court has defined such conduct as that which "shocks the conscience" and violates the "decencies of civilized conduct." *Rochin v. California*, 342 U.S. 165, 172-73 (1952) (holding use of evidence procured by forced pumping of suspect's stomach to obtain conviction for illegal possession of drugs violated substantive due process). The scope of substantive due process is very limited, and courts should be "'reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.'" *Campos v. Cook Cnty.*, 932 F.3d 972, 975 (7th Cir. 2019) (quoting *Collins*, 503 U.S. at 125). Accordingly, "[s]ubstantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, *but not against government action that is incorrect or ill-advised*." *Cunney v. Bd. of Trustees of the Village of Grand View, N.Y.*, 660 F.3d 612, 626 (2nd Cir. 2011) (emphasis added) (citation omitted). "The State will prevail if any rational basis for its action can be hypothesized." *Honeycutt v. Ong*, 806 N.E.2d 52, 58 (Ind. Ct. App. 2004).

[62] No matter how many times Melton describes the suspension of her license as "outrageous" or "outlandish," we are not persuaded that the sanction is arbitrary in the constitutional sense that it is irrational or "shocks the conscience." A rational basis for a three-year suspension for violating the standards of professional practice by having a sexual relationship with a student-athlete can be hypothesized. *See id*. In addition, Melton's specific

arguments about her sanction are also raised through other, non-constitutional means, *see* App., Vol. 2 at 69 (alleging the sanction is arbitrary and capricious, an abuse of discretion, and in excess of authority), and we will not expand the concept of substantive due process under these circumstances.[21]

### c. Equal Protection[22]

[63]  The Equal Protection Clause of the Fourteenth Amendment prohibits states from treating individuals who are similarly situated differently. *Reilly v. Daly*, 666 N.E.2d 439, 445 (Ind. Ct. App. 1996), *trans. denied*. But it does not require that all persons be treated either identically or equally. *Id.* at 445-46. Rather, equal protection analysis is implicated only if an individual has been treated differently from *similarly situated* persons. *Id*. at 446. To be considered "similarly situated," a plaintiff and those alleged to have been treated more favorably must be identical or directly comparable in all material respects. *LaBella Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937, 942 (7th Cir. 2010). The similarly situated analysis "is not a precise formula but . . . similarly situated individuals must be very similar indeed." *Id.* (quotations omitted).

---

[21] In addition, Melton's claims are at least somewhat grounded in state statutes requiring that the Board seek consistency and explain deviations from prior decisions, and state law claims are not enforceable by the due process clause. *Albiero v. City of Kankakee*, 122 F.3d 417, 420 (7th Cir. 1997).

[22] The trial court may or may not have found an equal protection violation in the Judicial Review Order – in paragraph 28 of trial court's Conclusions of Law, it found that the allegation of an equal protection violation was "without substantive evidence[,]" but in paragraph one of the order, stated that because the Board "violated Melton's constitutional rights to substantive and procedural due process, free speech without retaliation, *and equal protection*," reversal was appropriate. Appealed Order at 12, 14 (emphasis added). Because we are not bound by the trial court's findings on judicial review, however, the apparent contradiction does not need to be resolved.

Melton alleged the Board treated her less favorably than it did male athletic trainers by imposing a harsher sanction on her than on those trainers. Specifically, Melton focuses on the Board's prior sanctions of 1) "a pedophile deemed a danger to his own and other children" and 2) "an athletic trainer who killed someone in a drunk driving incident[.]" Br. of Appellant at 34. The Board contends Melton failed to identify a similarly situated person who was treated differently,[23] and we agree.

In *Dickson v. Aaron*, 667 N.E.2d 759 (Ind. Ct. App. 1996), *trans. denied*, we considered whether Aaron, a Black female teacher who, among other things, ordered a pitcher of beer and drank in front of students during a field trip then drove them home and whose teaching contract was subsequently cancelled, was treated differently than Martin, a white male teacher who twice smelled of alcohol at school and was suspended without pay. *Id*. at 763. We noted that although both Aaron and Martin's conduct were violations of the school's policies, the "type of conduct was in fact different" and the two were therefore not similarly situated. *Id.* Both Aaron and Martin's conduct involved alcohol, but no students saw Martin drinking and his conduct was not criminal, whereas Aaron consumed at least part of a pitcher of beer in front of students and her conduct thereafter in driving them home could have resulted in a criminal

---

[23] Melton argues she designated "multiple male athletic trainers who were treated more favorably than her" via the list of athletic trainer disciplinary cases she provided to the Board. Reply Br. of Appellant and Br. of Cross-Appellee at 40-41. The Board does not dispute that she identified multiple persons she *believed* were similarly situated; it only disputes that those persons *were* similarly situated.

conviction. *Id.*; *see also Vukadinovich v. Bd. of Sch. Trustees of Mich. City Area Schs.*, 978 F.2d 403, 414 (7th Cir. 1992) (holding teacher who was terminated from employment after being found guilty of driving while intoxicated and public intoxication in one case and resisting law enforcement and operating a vehicle without a license in a second case was not similarly situated to other teachers who either had alcohol-related problems *or* had been arrested but not both and were not terminated: "This does not suffice for equal protection purposes."), *cert. denied*, 510 U.S. 844 (1993); *Sims v. Mulcahy*, 902 F.2d 524, 541 (7th Cir. 1990) (holding a Black woman employed as a parking monitor who was disciplined more harshly for being tardy fifteen times in seven years was not similarly situated to a white woman in the same position who was tardy nine times over the same period), *cert. denied*, 498 U.S. 897 (1990).

[66] Considering the fine distinctions made in *Dickson*, *Vukadinovich*, and *Sims*, we conclude Melton's comparators are not "very similar indeed." *See LaBella Winnetka, Inc.* 628 F.3d at 942. We do not discount the seriousness of the conduct by the other trainers, but we do note that it was not similar to Melton's. Neither male trainer's conduct was part and parcel of the provision of athletic training services. Neither male trainer's conduct involved sexual contact with a patient. Melton has not identified a similarly situated person who was treated differently than she was.

### d. First Amendment

[67] Finally, Melton contends the Board violated her constitutional rights by retaliating against her for her successful appeal of the Board's 2014 order. The

First Amendment protects the right to seek redress of grievances, including via the courts. *Bridges v. Gilbert*, 557 F.3d 541, 553 (7th Cir. 2009). In order to prevail on a First Amendment retaliation claim, Melton must show that 1) she engaged in activity protected by the First Amendment, 2) she suffered a deprivation that would likely deter such activity in the future, and 3) the activity was a motivating factor in the Board's decision. *Milliman v. Cnty. of McHenry*, 893 F.3d 422, 430 (7th Cir. 2018). The Board agrees that Melton's first appeal was a protected activity under the First Amendment, *see* Br. of Appellees/Cross-Appellants at 47, but disagrees that Melton has shown her previous appeal was a motivating factor in the Board's sanction decision.

[68] Initially, we note that Melton's claim of retaliation appears to be based on a faulty premise: she argues that the Court of Appeals determined in the first appeal that the Board's "*suspension* of Melton was indeed a 'wrong' against her." Br. of Appellant at 47 (emphasis added) (citing *Melton I*, 53 N.E.3d at 1220). But what the Court of Appeals actually decided was that suspending her *without a proper hearing* was a wrong against her. *See Melton I*, 53 N.E.3d at 1220. The court remanded for a hearing but made no comment on the sanction itself. To the extent Melton cites the decision in her first appeal for the proposition that any sanction the Board imposed following the remand hearing was improper retaliation, she is mistaken.

[69]     Melton has not shown that her appeal was the "but-for cause" of the Board's 2017 sanction.[24] The sanction was imposed because of Melton's admitted conduct in violating the standards of professional practice. Moreover, the sanction the Board imposed in March 2017 was shorter than the sanction originally imposed and therefore shows no retaliatory intent. In 2014, the Board suspended Melton for at least seven years, a suspension which could have expired in 2021. In 2017, after remand, the Board suspended Melton for no less than three years, a suspension which could expire in 2020, if it has not already. Melton repeatedly refers to the March 2017 sanction as an "effective seven-year suspension," *see, e.g.,* Br. of Appellant at 27, 33, 39, and contends this suspension "[in] effect . . . equaled seven years because [she] had been unable to practice as an athletic trainer since December 31, 2012 due to the expiration of her athletic trainer's license as well as the continued pendency of the administrative complaint[,]" *id.* at 23. But in complaining about this "effective seven-year suspension," Melton does not acknowledge that the Board had nothing to do with her license expiring on December 31, 2012 – she has not

_____

[24] Although we hold Melton has not proved the but-for causation element of a First Amendment retaliation claim and therefore need not address the deterrence element, we note that we evaluate the deterrent effect by an objective test: "whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity." *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020). The fact that Melton has in fact pursued this second appeal is not a consideration: "a specific plaintiff's persistence does not undermine his claim. In fact, a contrary rule would stymie every First Amendment retaliation suit: Only plaintiffs who refuse to be silenced make their way to . . . court." *Id.* at 646-47 (citation omitted). However, we believe the Board's alleged conduct – still imposing a sanction for wrongful conduct after a successful appeal alleging procedural defects, but imposing a lesser sanction upon hearing Melton's evidence in mitigation – would not likely deter a reasonable person from appealing earlier conduct she felt was a violation of her rights.

been licensed since January 2013 in part due to the fact she let her license expire before any of these proceedings began. From January 2013 to February 2014, her license was in "expired" status, as it was from the time of the first *Melton* decision in April 2016 until the Board issued a new order in March 2017, and as it has been from the time the trial court granted the petition for judicial review in April 2018. The sanction we are reviewing here is a three-year suspension, and Melton has failed to show that it was motivated by her earlier appeal.[25]

[70] Finally, Melton contends the Board's retaliatory intent is clear because the State "explicitly asked [the Board] to find against Melton because she did not simply 'just let this die' . . . and instead 'pursue[d] the appeal'" of the 2014 order, and the Board "adopted" that logic when it found that Melton "believe[d] the seven year suspension imposed in 2014 was a wrong against her" by the Board. Br. of Appellant at 47 (quoting App., Vol. 5 at 90 (transcript of Board hearing) and Vol. 2 at 124 ¶ 60 (Board's 2017 order)). Melton takes the State's above statements from the Board hearing somewhat out of context: the State's comments were made as part of a larger argument to the Board summarizing that Melton repeatedly showed concern only for how these proceedings have affected her. *See* App., Vol. 5 at 90 ("Repeatedly in Miss Melton's testimony she talked about how this affected her. Over and over and over again. She said, I'm so embarrassed. I never thought that I would do something like this

---

[25] We also note, based on the captions of Melton's action in *Melton I* and the caption in this case, that the members of the Board changed between the 2014 and 2017 decisions. *See supra* ¶¶ 5 n.3, 11.

that would affect the rest of my life. I'm sorry because I lost everything. This has impacted me greatly. She said when asked why did she keep going instead of just let this die, why did she pursue the appeal and come back. Because she felt she had been wronged."). Although we agree with Melton that the State's comment was inappropriate and if not for the Board being meticulous in its findings and providing enough information for it to be apparent that the Board was not punishing her for appealing, might have amounted to reversible error. However, the Board's one finding that Melton believed she had been wronged by the seven-year suspension is both true based on her testimony and, in the context of the Board's sixty-eight other findings, not indicative of a retaliatory intent in imposing a sanction for Melton's conduct.

### e. Summary

[71] Melton has not demonstrated that the Board's action was "contrary to constitutional right, power, privilege, or immunity" and she therefore is not entitled to relief from the Board's order on that basis.

## 2. In Excess of Statutory Authority/ Without Observance of Required Procedure

[72] Melton also alleged in her petition for judicial review that the Board's sanction decision "far exceeded the bounds of proportionality" relevant to other Board decisions and that the variance was not adequately explained. *See* Ind. Code § 25-1-9-13. Therefore, Melton argued, the Board's decision was in excess of its statutory authority and without observance of procedure required by law.

[73]     In *LTV Steel Co. v. Griffin*, 730 N.E.2d 1251 (Ind. 2000), the Indiana Board of Safety Review dismissed charges of serious and knowing workplace safety violations against a company upon finding the state safety inspector who conducted the investigation had a conflict of interest in violation of the state ethics code. But exclusive jurisdiction to receive, hear, and adjudicate complaints alleging a violation of the state ethics code is entrusted to the State Ethics Commission. *See* Ind. Code §§ 4-2-6-4, -9(a). The court therefore held the safety board's dismissal was not in accordance with law and was in excess of the board's statutory jurisdiction because there is nothing in the safety board's governing statutes that authorizes it to adjudicate violations of the ethics code. *LTV Steel Co.*, 730 N.E.2d at 1258.

[74]     Here, the Board has the statutory authority to set standards for the practice of athletic training, enforce those standards, and impose discipline if it finds those standards have been violated. *See generally* Ind. Code chs. 25-5.1-2 and 25-1-9. Unlike in *LTV Steel Co.*, no other entity has that authority here, and the discipline imposed was within the panoply of acceptable disciplinary sanctions set out by the legislature. Thus, the Board did not exceed its statutory authority in disciplining Melton. In addition, by statute, the Board must seek to achieve consistency in its decision-making and explain significant departures from prior decisions involving similar conduct. The Board issued a written order explaining that it found the athletic trainer discipline cases cited by Melton to be *dissimilar* to her case and providing the reasoning behind its sanction decision. It therefore observed the procedures set forth by law. The fact that

Melton disagrees with the Board's sanction decision does not make it outside the proscribed law.

### 3. *Arbitrary and Capricious/*
### *Unsupported by Substantial Evidence*

Finally, Melton alleged the Board's sanction decision was arbitrary and capricious and unsupported by substantial evidence. *See* App., Vol. 2 at 69-70.

Melton argues the Board's findings are unsupported by substantial evidence because multiple findings were based on hearsay, unqualified witness testimony, or unsupported by admissible evidence. However, administrative hearings, unlike judicial proceedings, are conducted "in an informal manner without recourse to the technical, common law rules of evidence applicable to civil actions in the courts." Ind. Code § 4-21.5-3-25(b); *see* Ind. Evidence Rule 101(a) ("These rules apply to proceedings *in the courts of this State*[.]") (emphasis added). Melton's technical challenges to the evidence considered by the Board are therefore irrelevant. Nevertheless, an administrative agency's findings "must be based upon the kind of evidence that is substantial and reliable." Ind. Code § 4-21.5-3-27(d).

When we conduct judicial review of an agency's decision, we may not reweigh the evidence or judge the credibility of witnesses. *Ind. Family & Soc. Servs. Admin. v. Pickett*, 903 N.E.2d 171, 175 (Ind. Ct. App. 2009). In determining whether findings are supported by substantial evidence, "[w]e analyze the record as a whole, looking for such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Pack v. Ind. Family & Soc. Servs. Admin.*, 935 N.E.2d 1218, 1225-26 (Ind. Ct. App. 2010) (citation and quotation omitted). Evidence will be considered substantial when it is "more than a scintilla[,]" *Ind. High Sch. Athletic Ass'n, Inc. v. Watson*, 938 N.E.2d 672, 681 (Ind. 2010), and where there is a "reasonably sound basis of evidentiary support" for the Board's decision, we will uphold the Board's findings of fact, *Pack*, 935 N.E.2d at 1226. In short, "the facts are to be determined but once." *Andrade v. City of Hammond*, 114 N.E.3d 507, 514 (Ind. Ct. App. 2018), *trans. denied*, *cert. denied*, 140 S.Ct. 127 (2019).

[78]     Having thoroughly reviewed the record of the Board proceedings and the Board's order, we conclude the Board's findings are supported by substantial evidence. There is substantial and reliable evidence in the record that C.J. was harmed by his relationship with Melton,[26] that Melton was aware of appropriate boundaries but did not observe them, and that Melton was either unable or unwilling to recognize that her behavior was damaging to anyone other than herself. *See* App., Vol. 5 at 66, 74, 76 (Melton testifying, "I never thought that I would ever jeopardize my life the way I have" and also, "I didn't kill anyone. . . . [C.J. is] still alive and well. I did not physically take him away.").

---

[26] Melton's challenges to the findings about the relationship's effects on C.J. focus on the facts least favorable to the Board's decision and essentially ask us to reweigh the evidence and judge C.J.'s credibility for ourselves. Also, to the extent Melton argues there is no expert testimony to support a finding of harm, we note only that Melton offered no authority for the proposition that an expert is required to verify a person's testimony about the effects of an event on his or her own life.

[79] Finally, a decision is arbitrary and capricious if it is made without any consideration of the facts and lacks any basis that might lead a reasonable person to make the same decision as the administrative agency. *Ind. Pesticide Review Bd. v. Black Diamond Pest & Termite Control, Inc.*, 916 N.E.2d 168, 179 (Ind. Ct. App. 2009), *trans. denied*. A decision may also be arbitrary and capricious where only speculation furnishes the basis for a decision. *Id*. In other words, an agency decision is arbitrary and capricious "where there is no reasonable basis for the decision." *Ind. State Bd. of Health Facility Adm'rs v. Werner*, 841 N.E.2d 1196, 1207 (Ind. Ct. App. 2006), *trans. denied*.

[80] Melton's litany of complaints seems to fall primarily in the category of alleging the Board made its decision without any consideration of the facts, but what she is actually arguing is that the Board's decision was made without consideration of the facts *she* felt were important. For instance, she argues the Board "mentioned yet ignored" the evidence provided by mental health professionals that Melton did not pose an unreasonable risk of harm to patients if her license was reinstated. App., Vol. 2 at 63, ¶ 42. However, the Board did not ignore this evidence; it acknowledged the affidavits but noted it was also concerned with the harm she had already inflicted – and the Board was in fact charged with imposing a sanction for Melton's past conduct. *See* Ind. Code § 25-1-9-4.

[81] Melton also argues her sanction was inconsistent with prior decisions, but Melton has not shown that the sanction of a three-year suspension for her conduct was a significant departure from prior decisions involving similar conduct. Melton identified several Board decisions that she believed involved

conduct similar to hers, but the Board did not agree the conduct was similar and explained why; namely, the cases offered by Melton did not involve sexual contact in connection with the delivery of services to the public. Further, the ultimate issue is whether we agree that previous Board decisions were similar, and we have already determined in addressing Melton's equal protection argument that they are not. *See supra* ¶ 66. Again, the fact that *Melton* believes her conduct was similar does not mean the Board was obligated to agree or that finding otherwise was an arbitrary and capricious decision. Melton further faults the Board for, upon finding its own previous cases to be insufficient comparators, using teacher discipline cases as a guide. As noted above, *see supra* ¶ 9, Melton did not object to the State offering those cases for the Board's consideration, and also, Melton herself offered attorney discipline cases, which would be subject to the same objections Melton has now made to the teacher cases – that they are decided under a different rubric than the discipline of health professionals. The Board specifically acknowledged that athletic trainers are not teachers but also noted the similarities between the position Melton was in at the School and teachers in reaching its decision.

[82] In short, the Board has broad discretion in imposing sanctions—up to and including permanent revocation of a license—on an athletic trainer whom it finds to be subject to disciplinary sanctions. *See Davis*, 3 N.E.3d at 548 (case involving the State Board of Nursing, also subject to the provisions of Indiana Code chapter 25-1-9, revoking a nursing license). We conclude the Board afforded Melton fair proceedings and acted within its authority in suspending

her license.  There is a reasonable basis for the Board's decision, and it is not arbitrary and capricious.  We therefore affirm the Board's decision in all respects and reverse the trial court's Judicial Review Order, including the provision awarding Melton attorney fees and expenses.[27]

# Conclusion

[83]  The trial court properly granted summary judgment to the Defendants on Melton's Section 1983 claims because IPLA and the Board are not amenable to a Section 1983 lawsuit, the Board Members in their individual capacities have absolute quasi-judicial immunity for their adjudicative actions, and although Melton requested injunctive relief, she did not request such relief from the Board members in their official capacities.  Accordingly, the trial court's Section 1983 order is affirmed.

[84]  In keeping with our standard for reviewing agency actions that the facts are to be determined "but once[,]" *Andrade,* 114 N.E.3d at 514, we conclude Melton has failed to meet her burden of demonstrating the Board's action was invalid pursuant to the provisions of Indiana Code section 4-21.5-5-14(d), as the Board's decision is supported by substantial evidence and we will not substitute

---

[27] In challenging the grant of summary judgment in her opening brief, Melton argued that immunity does not foreclose an award of attorney fees and expenses.  *See* Br. of Appellant at 50 (citing *Ross*, 790 N.E.2d at 121-22).  Although this may be true if the plaintiff otherwise obtains at least some relief on the merits of a claim, *see Ross*, 790 N.E.2d at 121, Melton is not the prevailing party on any of her claims and therefore is not entitled to an award of attorney fees and expenses.

our judgment for that of the Board regarding the appropriate sanction for Melton's professional misconduct. The trial court's Judicial Review Order deciding otherwise is reversed, and the Board's March 2017 decision is affirmed.

[85] Affirmed in part and reversed in part.

Bradford, C.J., and Altice, J., concur.